The **UNIVERSITY OF COLORADO FOUNDATION, INC.; the University of Colorado, an institution of the State of Colorado; the Board of Regents of the University of Colorado, a body corporate of the State of Colorado; Robert H. Allen, an individual; and Paul A. Seligman, an individual, Plaintiffs,**

v.

**AMERICAN CYANAMID COMPANY, a Maine corporation, Defendant.**

No. CIV. A. 93–K–1657.

United States District Court, D. Colorado.

July 7, 2000.

Robert N. Miller, LeBouf, Lamb, Greene & MacRae, L.L.P., Denver, CO, Harold A. Haddon, Haddon, Morgan & Foreman, P.C., Denver, CO, for Plaintiff.

Roger P. Thomasch, Ballard, Spahr, Andrews & Ingersoll, LLP, Denver, CO, Daniel J. Thomasch, Lauren J. Elliott, Orrick, Herrington & Suteliffe, LLP, New York, NY, for Defendant.

## MEMORANDUM OPINION ON REMAND

KANE, Senior District Judge.

This patent/copyright and common law fraud action is before me on remand from the Federal Circuit Court of Appeals, and specifically on Plaintiffs' Motion for Entry of Judgment as a Matter of Law. The remand is the result of various appeals and cross appeals of my rulings in two 1995 decisions on motions for summary judgment,[1] and my Findings of Fact and Con-

---

1. *University of Colo. Found., Inc. v. American Cyanamid,* 880 F.Supp. 1387 (D.Colo.1995)(rejecting, as a matter of law, Plaintiffs' common law claim of conversion as well as Plaintiffs' claim for correction of patent under 35 U.S.C. § 256, but finding Plaintiffs had standing to pursue claims for equita-ble title/relief under Patent Act)(*Cyanamid I*) and *University of Colo. Found., Inc. v. American Cyanamid,* 902 F.Supp. 221 (D.Colo. 1995)(on reconsideration of *Cyanamid I,* agreeing with Cyanamid that Plaintiffs' equi-

clusions of Law issued in 1997 after a three-week bench trial on Plaintiffs' claims for fraud and unjust enrichment. *University of Colo. Found. v. American Cyanamid Co.*, 974 F.Supp. 1339, 44 U.S.P.Q.2d 1231 (D.Colo.1997)(*Cyanamid III* ). In *Cyanamid III*, I found in favor of Plaintiffs and against Cyanamid on both claims, awarding nearly $45 million in compensatory damages to the University and assessing $1 million in punitive damages against Cyanamid—$500,000 each, to individual Plaintiffs Allen and Seligman (the Doctors). 974 F.Supp. at 1359–60. Upon entry of final judgment, both sides appealed various aspects of the orders and judgments entered against them.

In a decision issued November 19, 1999, the Federal Circuit Court of Appeals affirmed in part and reversed in part, vacating certain of my findings and legal conclusions and remanding the case for further proceedings. *University of Colo. Found., Inc. v. American Cyanamid Co.*, 196 F.3d 1366 (Fed.Cir.1999). Arguing the record developed during the pretrial and trial proceedings in this case is adequate under the legal standards articulated by the Court of Appeals to permit disposition of the remanded issues without further supplemental proceedings, Plaintiffs moved for entry of judgment as a matter of law. Cyanamid objected, and, after briefing, I heard oral argument on the Motion. I now issue my ruling, and order that (1) judgment on Plaintiffs' claims for fraud and unjust enrichment re-enter in favor of Plaintiffs and against Defendant under the standards articulated by the Federal Circuit Court of Appeals on remand; (2) Drs. Allen and Seligman be declared equitable titleholders of the '634 patent at issue; (3) Drs. Allen and Seligman be substituted for Dr. Ellenbogen as the true and correct inventors of the subject of the '634 patent under 35 U.S.C. § 256; and (4) the question of the amount of damages or other equitable monetary relief to be awarded Plaintiffs on their fraud and unjust enrichment claims be retried in accordance with the guidelines for awarding damages articulated by the Court of Appeals in its ruling.

## I. BACKGROUND

### A. Facts

The facts giving rise to Plaintiffs' Complaint have been repeated in each of the four written decisions issued in this litigation to date, and are set forth fully in *Cyanamid III*. See *Cyanamid III*, 974 F.Supp. at 1343–52. I revisit these facts briefly, supplementing and clarifying them where appropriate based upon an exhaustive review of the trial transcript and exhibits which are now three years old, as a preface to my discussion of the issues on remand.

Because iron deficiency is a serious concern for pregnant and lactating women, prenatal supplements containing 60 to 65 mg of iron, taken once daily, are widely used to assure that pregnant women absorb the approximately 3.5 mg of supplemental iron per day they require. Materna, the prenatal multivitamin/mineral supplement brand produced and sold by Cyanamid's Lederle Laboratories, contains 60 mg of iron.

In 1979, the manufacturer of a competing prenatal supplement, Stuartnatal, began advertising that its product provided superior iron absorption to that of Materna. To refute these claims and protect its market share, Cyanamid authorized its chief chemist, Dr. Leon Ellenbogen, to commission a study to compare iron absorption in women taking Stuartnatal or Materna. Dr. Ellenbogen asked his friend and long-time professional colleague, University of Colorado researcher and hematologist Dr. Robert Allen, to perform the study. Dr. Allen agreed and, together with his colleague Dr. Paul Seligman, conducted the comparison study in the summer of 1979.

table title claim must fall with claim for relief under § 256 of Patent Act)(*Cyanamid II* ).

In a finding that pleased Cyanamid, the study confirmed the amount of iron absorbed by pregnant women taking Materna was no less, and, in fact, was slightly better, than by those taking Stuartnatal.[2] Of concern to the Doctors, however, was the finding that neither product provided iron absorption in an amount approaching the 3.5 mg recommended for pregnant women.

The Doctors conducted a follow-up study (Study IA) to determine the absorption rate of iron ingested alone, without the various minerals and vitamins included in prenatal supplements. At the end of Study IA, the Doctors compared the high rates of absorption when iron was ingested alone with the suppressed absorption rates discovered in Study I and found there was a "serious problem with both Materna and Stuartnatal." (Testimony of Dr. Allen, Tr. at 431:16–18.)

Suspecting the calcium and magnesium salts included in relatively large amounts in both supplements adversely affected absorption rates, they immediately designed another follow-up study (Study II) of the effects on iron absorption of calcium sulfate, calcium carbonate, magnesium oxide and combinations thereof, in the amounts present in Stuartnatal and original Materna.[3] Both Studies IA and II were instigated by the Doctors without protocols or specific payment from Cyanamid. *Cyanamid III* at 1346; *see also* Tr. at 433–35 (testimony of Dr. Allen). Test subjects were paid from the University of Colorado hematology division's general account. (Tr. at 433:6–435:18).

Out of Studies IA and II came the initial idea at the heart of this litigation, namely, that the large amounts of calcium carbonate and magnesium oxide in Materna were inhibiting iron absorption and that Materna could be reformulated to reduce or eliminate this effect. As Dr. Allen reported to Dr. Ellenbogen in his December 4, 1979 letter:

I am enclosing a summary as well as specific details of the recent evaluation that we performed of the effects of various calcium and/or magnesium salts on iron absorption. I believe that the results strongly indicate that magnesium oxide, magnesium sulfate, and calcium carbonate all decrease iron absorption in humans, and that such inhibition is not caused by calcium sulfate. The inhibition observed with the combination of calcium carbonate and magnesium oxide appears to explain most of the decreased iron absorption that we have observed previously with Materna . . . .

Based on the studies that we have performed to date, I believe that iron absorption from prenatal capsules could be increased markedly if calcium sulfate was used in place of calcium carbonate, if the amount of magnesium oxide was reduced or omitted entirely, and if particular care was paid to the rate at which iron from such a capsule was available to go into solution. If such a prenatal capsule is perfected, I believe that this would be of definite benefit to pregnant women and would also benefit the company involved since its share of the prenatal market should increase dramatically. I hope that Lederle will want to pursue the preparation of an improved prenatal capsule and I hope that we can continue to work together in this regard in the future . . . .

(Ex. 79).

Having gathered momentum for their reformulation idea and not wanting to wait for the wheels at Cyanamid to turn, the Doctors immediately began preparations for a third study (Study IIA) to determine

---

**2.** Study I determined that pregnant women taking Stuartnatal absorbed 2.0 mg of supplemental iron per day, while women taking Materna absorbed 2.8 mg of supplemental iron per day. *See* Table I of the Doctors' 1981 New England Journal of Medicine manuscript (Tr. Ex. 149).

**3.** Original Materna contained 350 mg of calcium in the form of calcium carbonate and 100 mg of magnesium in the form of magnesium oxide. Stuartnatal contained 200 mg of calcium in the form of calcium sulfate, and 100 mg of magnesium oxide.

the specific levels of calcium carbonate and magnesium oxide at which the inhibitory effect occurs. They designed their own protocol, and again paid subjects out of the University hematology department's general fund. Study IIA, conducted in February 1980, revealed there was a "threshold effect with calcium carbonate." (Tr. at 432 (testimony of Dr. Allen).) As Dr. Allen explained at trial, "It wasn't [that] you got inhibition increasing at every level, but at 200 milligrams, somewhat more than that, you did not get inhibition, and that led to the second reformulation, the one I described in the March 1980 letter." *Id.* In that letter, the content of which I also reiterate because of its significance to the factual issues to be determined on remand, Dr. Allen referenced the enclosed results of Study IIA and stated:

> The data indicate that there is no significant inhibition of iron absorption by either 350 *mg* of calcium in the form of calcium sulfate or 200 mg of calcium in the form of calcium carbonate. As we have discussed previously, I believe that the next step would be for Lederle to reformulate their Materna preparation such that it contains 200 mg of calcium in the form of calcium carbonate and 25 mg of magnesium in the form of magnesium sulfate or magnesium oxide. Once this is done, we will test this preparation versus iron alone and I would expect that the absorption of iron from the new Materna should be similar to that of iron alone.

(Ex. 85.)

Upon receiving Dr. Allen's letter, Dr. Ellenbogen drafted a "protocol" for the already completed Study IIA, which he sent to Dr. Allen, and asked Dr. Allen to perform a new major study in which iron absorption from Stuartnatal would be compared with various reformulations of Materna suggested by the Doctors' work in Studies IA, II and IIA. Cyanamid prepared the protocol, and in October 1980, Study III was conducted using two reformulations of Materna. Reformulation A kept the 350 mg of calcium carbonate present in original Materna, but reduced the magnesium oxide from 100 mg to 25 mg. Reformulation B, the formulation ultimately manufactured and marketed as reformulated Materna, reduced the calcium carbonate to 250 mg and also used 25 mg of magnesium oxide. The results of Study III, as predicted by the Doctors based on the results of Study IIA, showed the reduction in magnesium oxide in Reformulation A improved iron absorption slightly (from 2.8 mg to 3.0 mg), while the reduction in calcium carbonate in Reformulation B (from 350 mg to 250 mg, an amount approaching, but not quite at, the 200 + mg threshold level at which no inhibitory effect could be expected) improved absorption to 5.0 mg, less than that for iron alone but well above the 3.5 mg recommended for pregnant women.

In *Cyanamid III* I found, and reiterate in the strongest terms here, that the critical studies IA, II and IIA, were conceived of, designed and conducted by the Doctors independently of Dr. Ellenbogen and Cyanamid. While there is no dispute that the Doctors communicated with Dr. Ellenbogen throughout this process, and designed their studies, in part, around Cyanamid's marketing interests *vis à vis* Stuartnatal, the idea for reformulating Materna, and the research, concepts and ideas necessary to its formation and testing, were *entirely* the Doctors'.

Once Reformulation B was discovered and its improvement in iron absorption quantified, Cyanamid asked the Doctors to perform a fourth study comparing the absorption of iron alone with the absorption of iron from Stuartnatal, Reformulation B of Materna, and two other competing prenatal multivitamin-mineral supplements (Natalins and Natafort). Study IV, performed in March 1981, confirmed that reformulated Materna provided the highest iron absorption (this time 4.1 mg, for an average over Studies III and IV of 4.5 mg) of the four products tested.

The Doctors wrote up the results of their studies in an article entitled, "Inadequate Iron Absorption from Many Prenat-

al Multivitamin–Mineral Supplements" (the Article). (Tr. Ex. 149.) The focal point of scientific interest in the Article was Table I, which presented the results of the Studies I, II, III and IV in a distinctive format with four main columns, nine sub-columns and 12 rows. The information in Table I was also presented in graph form in four figures. The Doctors submitted the Article in manuscript to the New England Journal of Medicine for consideration in July 1981, and, as a courtesy long extended to Dr. Ellenbogen over the course of their personal and professional relationship both before and thereafter, sent a copy to Dr. Ellenbogen. In the Article the Doctors claimed credit for the design and conduct of the studies, and the discovery and testing of a range of reformulations to increase iron absorption from prenatal multivitamin/mineral supplements. Dr. Ellenbogen voiced no complaint or objection to this, nor to the fact that he was never mentioned or credited in the Article with any of the studies' designs or results. Nevertheless, and within days of receiving the Article, Dr. Ellenbogen had filled out a Cyanamid company form called a "Record of Inventorship" claiming inventorship of Reformulation B, and Cyanamid began the first steps toward patenting it.

Cyanamid began selling a reformulation of Materna based on the 250 mg calcium carbonate/25 mg magnesium oxide Reformulation B in early fall of 1981. Shortly before announcing the reformulation, and without informing the Doctors or the University, Cyanamid copied significant portions of the Article, specifically including Table I and its supporting Figures 1–4 in their entirety, into a patent application.[4] As part of the application, Dr. Ellenbogen completed an affidavit of inventorship, swearing he was the true and sole inventor of the patented technology. He also completed an in-house Cyanamid form called a "Record of Invention." This form contained a line for insertion of the "date of

conception of the invention." Notwithstanding a document retention policy requiring such forms to be maintained in two separate places for the "life of the company," the form completed by Dr. Ellenbogen is missing from both places and was never located or produced at trial. When asked at trial what date he filled in as the conception date of his invention, Dr. Ellenbogen stated that he does not remember. *See Cyanamid III* at 1349.

Cyanamid's patent application, finally filed in December 1981, claimed exclusive rights to the reformulation and named Dr. Ellenbogen as its sole inventor. United States Patent No. 4,431,634 (the " '634 Patent") issued from this application in 1984. From 1984 until the time of trial, Cyanamid had enforced its patent rights six times to exclude generic competitors from using the reformulations contemplated by the results and data in Table I and Figures 1–4 of the Article.

Notwithstanding the Doctors' personal and professional relationship with Dr. Ellenbogen, and in part, I found, to secure the Doctors' continued cooperation and work, neither Dr. Ellenbogen nor Cyanamid mentioned anything about the patent application, the filing of an affidavit in support of it crediting Dr. Ellenbogen with instigating and supervising all of the studies, the issuance of the Patent itself, the award given Dr. Ellenbogen for being named the inventor on a successful patent, or the six civil enforcement actions brought by Cyanamid to prevent generic drug companies from using the patented technology, from the time the Doctors sent the New England Journal of Medicine manuscript to Dr. Ellenbogen in July 1981 until Dr. Ellenbogen inadvertently let the information slip in a 1993 conversation with Dr. Seligman over dinner. *Cyanamid III* at 1350.

---

4. Because the striking similarities between the patent application and the Article—at the heart of this case again on remand—are shown best by the documents themselves, I have, for ease of reference and comparison, attached the charts and tables of each to the text of this opinion as Appendices 1 and 2, respectively.

In the interim the Doctors continued to work for Cyanamid and send Dr. Ellenbogen drafts of papers and other works in progress (including a revision of the New England Journal of Medicine manuscript entitled "Measurements of Iron Absorption from Prenatal Multivitamin–Mineral Supplements," later published by the Journal of Obstetrics and Gynecology in 1983, and, upon receipt, a copy of the Journal's confidential letter of acceptance). When the Doctors finally obtained a copy of the Patent and saw the copied data table and the content based almost entirely on their Article, they and the University filed suit.

### B. *The Proceedings to Date*

The Doctors' lawsuit alleged that (1) Doctors Allen and Seligman, not Dr. Ellenbogen, invented the reformulation of Materna covered by the '634 patent claims and communicated the invention to Dr. Ellenbogen; (2) Dr. Ellenbogen intentionally omitted the Doctors as co-inventors in the patent application; and (3) Dr. Ellenbogen and Cyanamid intentionally hid the Patent from the Doctors during the course of their continued relationship. The University and the Doctors sought restitution and disgorgement of Cyanamid's profits, equitable title to the '634 Patent, and substitution of the Doctors for Dr. Ellenbogen as inventors on the Patent under 35 U.S.C. § 256 (1994).

Cyanamid responded that Dr. Ellenbogen hired the Doctors to perform the research that convinced Cyanamid to reformulate Materna and asserted that Dr. Ellenbogen was the true inventor of the reformulation. It maintained the Doctors transmitted the results of their unfunded research to Cyanamid in 1979 and 1980 with the intention that Cyanamid would reformulate Materna and profit thereby. As such, Cyanamid claimed it was under no obligation to notify the Doctors of the patent application or the Patent itself, and denied any liability to the University. As affirmative defenses, it asserted that the doctrines of preemption by federal patent law, laches, and limitations under relevant statutes barred the University's claims.

The parties filed cross-motions for summary judgment. In *Cyanamid I*, I found Plaintiffs' § 256 claim for correction of the '634 Patent barred as a matter of law, agreeing with the district court's interpretation in *General Elec. Co. v. Brandon*, 25 U.S.P.Q.2d 1885, 1887 (N.D.N.Y.1992) that § 256 was intended to permit correction of inventorship only where the error is "inadvertent and 'without deceptive intent,'" and that a patent procured by fraud as alleged by Plaintiffs would be void and not subject to correction. *Cyanamid I*, 880 F.Supp. 1387, 1398. Because Plaintiffs could not have legal title to the Patent under the Act, I also concluded Plaintiffs lacked standing to seek damages for infringement. *Id.* at 1397 (citing *Arachnid Inc. v. Merit Indus., Inc.*, 939 F.2d 1574, 1578–79 (Fed.Cir.1991)).

In addition, I granted Cyanamid's motion for summary judgment on Plaintiff's common law claims for conversion, breach of confidentiality obligation and unfair competition. I declined, however, to enter summary judgment against Plaintiffs on their unjust enrichment, equitable title or copyright claims, and found fact issues precluded summary judgment on Cyanamid's limitations defense. *Id.* at 1406. Finally, I found, as a matter of law, that the four bar graphs and data table in the Doctors' 1981 New England Journal of Medicine manuscript were copyrightable and had been wrongfully copied by Cyanamid into the patent application. *Id.* at 1400–02.

Cyanamid moved for reconsideration of several of the rulings adverse to it in *Cyanamid I*, and in *Cyanamid II*, I issued a written decision granting that motion in part and denying it in part. I agreed with Cyanamid that, given my interpretation of § 256 under the *General Electric* case, the Doctors' claims to equitable title to the Patent must also fall. 902 F.Supp. at 222–23. Assuming a patent rendered erroneous as a result of deception is invalid and

not subject to correction under § 256, I determined Plaintiffs' equitable title claim must fail because "'there can be neither legal nor equitable ownership of a void patent.'" *Id.* (quoting *Kennedy v. Hazelton,* 128 U.S. 667, 9 S.Ct. 202, 32 L.Ed. 576 (1888)). I ordered that summary judgment enter in Cyanamid's favor on Plaintiffs' equitable title claim, but denied the motion in all other respects.

Following a bench trial on the Doctors' and University's remaining claims, I issued the *Cyanamid III* decision. That decision included detailed findings of fact based on the submissions of the parties and thousands of pages of testimony and evidence received at trial. 974 F.Supp. 1339, 1343–52. Those findings included a chronology of the communications and studies leading to the reformulation of Materna, and a determination that the work, studies and ideas ultimately patented by Cyanamid were discovered and developed by the Doctors, "[e]ntirely independent of Cyanamid." *Id.* at 1347.

My findings also tracked the web of deceit spun by Dr. Ellenbogen beginning soon after he received the manuscript of the Article in July 1981. *Id.* at 1348–50. Caught in this web was Cyanamid patent counsel Dr. Raymond, who knew the Doctors had authored the article from which much of the patent application was copied, but copied the material anyway based on Dr. Ellenbogen's representations that Cyanamid had paid for and he had designed all of the studies, and that the roles of the Doctors in them were merely technical. *Cyanamid III* at 1348–49. At trial, Dr. Raymond testified he would not have listed Dr. Ellenbogen as the reformulation's inventor had he known the true facts. *Id.* at 1349. Also included were Dr. Ellenbogen's repeated and deliberate attempts to conceal the patent application, and later the Patent itself, from the Doctors despite their continuing professional and personal relationships throughout that time. *Cyanamid III,* 974 F.Supp. at 1348–50.[5]

Based on these findings, I determined (1) Dr. Ellenbogen did not invent the Materna reformulation and that the true inventors were Drs. Allen and Seligman; (2) given the longstanding personal and professional relationship between Dr. Ellenbogen and Dr. Allen, and the longstanding confidential working relationship between Cyanamid and the University Doctors, the filing of the patent application was a material fact that in equity and good conscience should have been disclosed regardless of who was named as the inventor; (3) Dr. Ellenbogen deliberately concealed the application so he could continue the beneficial relationship with Dr. Allen, while retaining for Cyanamid the financial and competitive benefits of the Doctors' reformulation idea and for himself recognition and reward from his employer; and (4) the Doctors acted on this concealment by continuing to work for and benefit Cyanamid unaware that their idea had been appropriated or

---

**5.** In October 1981, for example, when Dr. Allen attended Cyanamid's press conference announcing the reformulation, no one, including Dr. Ellenbogen, mentioned the patent application to him. In 1982, during dinner with Dr. Seligman at a meeting of the International Society of Obstetrics and Gynecology, Dr. Ellenbogen made a disgruntled remark that Dr. Allen "wasn't the only one" who knew about patents but said nothing about the pending patent application that used Dr. Allen's reformulation studies as its foundation. In 1983, when the Journal of Obstetrics and Gynecology agreed to publish the Doctors' revised Article, Dr. Ellenbogen remained silent despite having received, from Dr. Allen, a copy of the article together with the Journal's acceptance letter advising Dr. Allen that "prior publication of any portion of this article, including tables, figures or graphs . . . will void this publication agreement." *Id.* at 1348. In 1984, when the Patent issued and Dr. Ellenbogen received an in-house award from Cyanamid as its inventor, neither fact was disclosed to the Doctors even though Dr. Ellenbogen was working with them during that time on the Pramilet study (Study V). Significantly, moreover, when the bottles of Materna were shipped to the Doctors for use in the Pramilet study, the labels which included the patent notice were obliterated by a sticker stating the contents were "FOR INVESTIGATIONAL USE" only.

that Cyanamid was working to exclude them and others from being able to use it in the future. *Cyanamid III,* 974 F.Supp. at 1347, 1353.

## II. *THE FEDERAL CIRCUIT'S DECISION*

In affirming in part, vacating in part, and remanding the case for further proceedings, the Federal Circuit Court of Appeals made four specific rulings: (1) with respect to Plaintiffs' fraud and unjust enrichment claims, the causes of action stand but federal patent law, rather than state law, supplies the standard of inventorship under federal preemption principles, *Cyanamid,* 196 F.3d at 1371–73; (2) the damages awarded Plaintiffs on their fraud and unjust enrichment claims were erroneously calculated, *id.* at 1373–74; (3) my rejection of Plaintiffs' patent correction and equitable title claims in *Cyanamids I* and *II* was based on an erroneous interpretation of § 256, *id.* at 1374–75; and (4) my finding that Plaintiffs had failed to carry their burden of proving damages related specifically to Cyanamid's copyright infringement was correct such that Plaintiffs were not entitled to any damages on that claim. *Id.* at 1376.

### A. *Fraud and Unjust Enrichment*

The principal finding of the Circuit Court was that the state law concepts of "ownership" or "inventorship" applied in *Cyanamid III* could not stand. The Court reasoned that while the fraudulent nondisclosure and unjust enrichment causes of action themselves "cover a broad range of conduct that does not bear on federal patent policies [and] are therefore not preempted by federal patent law," *Cyanamid,* 196 F.3d at 1371, the "federal Patent Act leaves no room for states to supplement the national standard for inventorship." *Id.* at 1372 (citing "explicit and detailed standards for inventorship" set forth at 35 U.S.C. §§ 101–03, 116–20, 254–56, 261–62).

Because I applied state law principles to find that the Doctors, rather than Dr. Ellenbogen, were the true inventors of the patented technology, the Federal Circuit concluded the principle of "field preemption" necessitated the vacatur of that finding and a reconsideration of the question of inventorship under federal patent standards on remand. *Id.* at 1373. As a result, the Court continued, those findings that "hinged" on this threshold determination—namely: that Cyanamid had a duty to disclose the filing of the application to the Doctors; that Cyanamid was liable to the University for fraudulent nondisclosure; and that the University and the Doctors were entitled to damages—would necessarily also have to be vacated. *Id.* (the findings and conclusions along "[t]he district court's chain of reasoning" must also be vacated because they "hinge[ ] on the finding that the Doctors were inventors of the Materna reformulation"). And for the same reason, my conclusion that Cyanamid was liable to the University for unjust enrichment would also have to be vacated because, "[l]ike the fraudulent nondisclosure claim, unjust enrichment hinges on the finding that the Doctors invented reformulated Materna." *Id.* at 1374. *See also* 196 F.3d at 1375 (Federal Circuit's conclusion reiterating ruling).

I pause briefly to address Cyanamid's contention that these vacaturs "extinguish" *Cyanamid III* in its entirety, rendering it of "no further force and effect" and "depriv[ing] it of its standing so that the law of the case doctrine is inapplicable." Def.'s Mem. in Opp. to Pl.'s Mot. Entry of J. at 2–3 (citing *Creighton v. Anderson,* 922 F.2d 443, 449 (8th Cir.1990)). As a result, Cyanamid argues the Federal Circuit's mandate to reconsider the question of inventorship and, if necessary thereafter, the issue of damages or other equitable relief, precludes the reentry of judgment on remand without first reopening evidence and retrying these issues of fact. I find Cyanamid's contentions sweep too broadly and contrary to the content and tenor of the Federal Circuit Court's opinion.

The Federal Circuit's review, and therefore its mandate, was limited to the matters appealed. *See Laitram Corp. v. NEC Corp.*, 115 F.3d 947, 951 (Fed.Cir.1997)(explaining that, upon return of a mandate, a district court cannot give relief beyond the scope of the mandate, but may act on matters left open by the mandate.) Here, the Federal Circuit took pains to identify those matters which were appealed and those which were not, *e.g.*, 196 F.3d at 1374 ("Cyanamid does not argue that the district court erred in any findings under its unjust enrichment analysis" and that "[t]herefore, this court does not review those findings"), and then parsed those matters further into those factual findings and legal conclusions which were necessarily vacated because they "hinged" on the erroneous threshold determination of inventorship, and those which were not.

In doing so, the Federal Circuit clearly approved the applicability of the state law causes of action asserted, and endorsed the "chain of reasoning" that led to the entry of judgment against Cyanamid on those claims. *See id.* at 1371–73 (rejecting Cyanamid's arguments that federal patent law preempted Plaintiffs' Colorado state law fraud and unjust enrichment claims and setting forth the elements of those claims under Colorado law). What it did not approve was the use of state law standards to resolve the threshold questions of inventorship and ownership on which those judgments rested. *Id.* at 1372.

■ Accordingly, as Plaintiffs correctly state, "[t]he linchpin" of the Federal Circuit's opinion and mandate as to Plaintiffs' fraud and unjust enrichment claims was "its conclusion that the judgment was based on the application of the wrong legal standard in determining inventorship." Pls.' Reply at 4. The mandate remanded the case for application of the correct legal standard to the facts elicited at trial. It did not expunge the facts elicited at trial or remand the case for a new trial. In fact, it left entire categories of factual findings intact because no appeal from them was taken. Such a mandate—premised on the approval of the crux of a cause of action and the "chain of reasoning" employed by the trial court in analyzing it—does not "extinguish" the underlying trial or deprive the proceedings of their "standing" for purposes of *res judicata*. It simply requires the trial court on remand to apply the correct law to the facts already determined to be sufficient to meet the correct legal standard. If they are, or if the record otherwise supports the Doctors' inventorship under the threshold inventorship determination to be reconsidered, then the mandate is satisfied. *See Laitram* at 952 (on remand, defendant was entitled to its requests for judgment as a matter of law, "which in no way were precluded by the mandate").

By approving this court's "chain of reasoning" as long as it flows from a proper determination of inventorship, the Federal Circuit's opinion and mandate will entitle the University to judgment as a matter of law on its fraud and unjust enrichment claims, without further proceedings, if the existing record supports such a determination. "[I]f the Doctors were inventors of reformulated Materna under federal patent law, [then] Cyanamid may be held liable pursuant to [both] the fraudulent nondisclosure claim" and the unjust enrichment claim which "hinges" upon it. 196 F.3d at 1374.

## B. Errors in the Damages Analysis on Fraud and Unjust Enrichment Claims

Anticipating the possibility that judgment on the University's fraud claim might be reentered on remand, the Federal Circuit proceeded to correct certain errors in my damages determination on the fraud claim so those errors would not be repeated. Specifically, the Federal Circuit rejected my finding that any fraudulent nondisclosure on the part of Cyanamid "deprived [the University] of financial opportunities and prestige [it] would have enjoyed had their doctors been credited with the invention, and harmed Drs. Allen and Seligman both personally and profes-

sionally." *Cyanamid III*, 974 F.Supp. at 1353. The Court determined, based on the record, that the Doctors "intended to, and did, freely share their research results to allow Cyanamid to make and sell an improved Materna," and that "[n]either the Doctors nor the University sought to obtain a patent covering the reformulation." *Cyanamid*, 196 F.3d at 1373. By declining to seek a patent in their own right, the Doctors "chose to forego" an opportunity to gain the prestige associated with the inventorship of a patent and were, instead, "presumably satisfied" with the prestige associated with publication of a journal article detailing their research. *Id.* at 1373–74. "Given that the University had never been in the business of manufacturing or marketing prenatal vitamins," the Federal Circuit concluded "the only financial opportunity that the University could have lost was the payment for an assignment of ownership rights in the '634 Patent or a license from the University to sell the reformulated product at the time the patent issued." *Id.* at 1373.

> Consequently, even if the Doctors were inventors of reformulated Materna under federal patent law, Cyanamid may be held liable pursuant to the fraudulent nondisclosure claim, but only for the payment that Cyanamid would have made to secure the Doctors' cooperation in filing the required documents with the PTO, an assignment of ownership rights and/or an exclusive license from the University.

*Id.* at 1374. It is under this damages analysis that reconsideration of the University's fraud claim must proceed.

### C. *Section 256 and Equitable Title Claims*

Also "hinging" on a determination that the Doctors were the true inventors of the '634 Patent subject matter are Plaintiffs' claims to correct the Patent under 35 U.S.C. § 256 and for equitable title, which were revived by the Federal Circuit on appeal. The claims were not reached in *Cyanamid III* because I had granted summary judgment on them in Cyanamid's

favor in *Cyanamids I* and *II*. Relying on case law decided after those decisions, the Federal Circuit vacated the grant of summary judgment in favor of Cyanamid on the correction of inventorship issue because "the district court's premise—that the actual inventors could not be substituted for a fraudulently-named inventor in a patent without thereby invalidating the patent—was incorrect." 196 F.3d at 1374–75 (citing *Stark v. Advanced Magnetics, Inc.*, 119 F.3d 1551, 1555 (Fed.Cir.1997) and *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1350 (Fed.Cir.1998)). Finding my grant of summary judgment on the equitable title claim similarly "sprang from [a] belief that the fraudulent deletion from the patent document of the true inventors, i.e., the Doctors, would render the patent invalid," the Federal Circuit vacated the grant of summary judgment on that claim as well, finding that "[t]o the contrary, substitution of the Doctors as named inventors under 35 U.S.C. § 256, if warranted, would not invalidate the patent and would establish the University's equitable title to it." *Id.* at 1375.

Based on this reasoning, the Federal Circuit directed not only that both claims be reconsidered on their merits, but also, as with the University's fraud and unjust enrichment claims, that liability on the part of Cyanamid would flow directly from a finding, on remand, that the Doctors were the true inventors of the reformulation under federal patent standards.

### III. *PLAINTIFFS' MOTION FOR REENTRY OF JUDGMENT ON REMAND*

In the wake of the Court of Appeals' decision, the University and the Doctors filed a Motion for Judgment as a Matter of Law on their fraud and unjust enrichment claims, as well as on the patent correction and equitable title claims the Federal Circuit determined were erroneously rejected in *Cyanamid I* and *II*. Plaintiffs claim the record developed during the trial and pretrial proceedings, together with those find-

ings in *Cyanamid III* not challenged on appeal, are sufficient by themselves to establish the Doctors' status as the true inventors of the '634 Patent technology under federal patent standards and support the reentry of judgment in their favor on each of the claims "hinging" upon it. Taking into consideration the Federal Circuit's standards for interpreting § 256, this includes each of Plaintiffs' claims for fraud, unjust enrichment, correction of the '634 Patent under § 256, and for equitable title.

Cyanamid disagrees, arguing that use of the federal patent standard now shifts the focus from inventorship of the reformulation published by the Doctors in journals to inventorship of the specific '634 patent technology, which should be defined solely by the claims of the '634 patent and not the composition of a commercially-marketed product that happens to fall within its scope. Cyanamid denies Plaintiffs have offered any competent evidence under federal patent standards to rebut the presumption of correctness of the inventor named in the Patent, or to establish that they, rather than Dr. Ellenbogen, invented the Patent's broader subject matter. Even if the Doctors were found to be the true inventors of the patented technology under federal patent standards, Cyanamid argues entry of judgment as a matter of law is precluded because the existing record is insufficient to comport with the Federal Circuit's directives on damages. *See Cyanamid*, 196 F.3d at 1373. I agree in part and disagree in part.

## IV. *DISCUSSION*

"Upon remand, the [district] court must apply federal patent law principles to determine whether the Doctors and/or Dr. Ellenbogen were inventors of the technology of the '634 patent." *Id.* at 1372.

### A. *The Federal Patent Scheme*

Title 35 of the United States Code sets forth the federal scheme for the protection of ideas and technology known as patent law. Under federal patent law, an invention must be novel, useful, and unobvious in order to qualify for patent protection.

35 U.S.C. §§ 101–103. The requirements are stringent and serve to effectuate the fundamental purpose of the United States patent system—the promotion of real innovation in science and technology. To motivate inventors to disclose innovations to the public, the system gives inventors a seventeen-year period during which an inventor holds exclusive rights to an invention in exchange for publicly disclosing his invention. 35 U.S.C. § 154; *see Graham v. John Deere Co.*, 383 U.S. 1, 6, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). In the absence of patent protection, all ideas in the public domain inure to the good of society. *Blonder–Tongue Lab. v. University of Illinois Foundation*, 402 U.S. 313, 345, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971).

As patents reward inventors for disclosing beneficial technology to the public, a person cannot reap the reward of exclusive rights to an invention without being the true inventor. *Agawam Co. v. Jordan*, 74 U.S. (7 Wall.) 583, 602, 19 L.Ed. 177 (1868). The importance of this requirement is reflected in the fact that the Patent Act twice states the person seeking patent protection must personally invent the subject matter of the invention. *See* Jackie Hutter, M.S., "A Definite and Permanent Idea? Invention in the Pharmaceutical and Chemical Sciences and the Determination of Conception in Patent Law," 28 J. Marshall L.Rev. 687, 695 (Spring 1995)(citing John W. Schlicher, Patent Law: Legal and Economic Principles, § 1.07 (1994), who notes that § 102(f) of the Patent Act expressly states that a person will lose patent rights if "he did not himself invent the subject matter sought to be patented," and § 101 providing that only " 'whoever invents or discovers ... may obtain a patent thereof ....' "). *See also* Monheit, R., "The Importance of Correct Inventorship," 7 J. Intell. Prop. L. 191 (Fall 1999)(citing U.S. Const. art. I, § 8, cl. 8)(based on the Constitution's grant of power to Congress to promote science, a patent can be issued only to its inventors).

In the instant case, Dr. Ellenbogen and Cyanamid secured for themselves the right

to exclude others from using technology that was intended to inure, and but for their actions would have inured, to the good of society in general. The question at trial, and now again on remand, is whether the actions of Dr. Ellenbogen and Cyanamid in concealing from the Doctors their efforts to secure for themselves these patent rights were fraudulent because it was the Doctors, and not Dr. Ellenbogen, who were the true inventors of the patented technology.

## B. Determination of Inventorship Under Federal Patent Act

The threshold issue, as identified by the Court of Appeals, is whether the Doctors were, in fact, the true and sole inventors of the patented technology under federal patent, rather than state common law, standards.

■ Recitation of the federal patent standard for inventorship is relatively straightforward and is not, as far as it goes, significantly disputed in this case. *Compare* Pls.' Mot. Entry of J. pp. 4–5 *with* Def.'s Mem. Law in Opp. to Pls.' Mot. pp. 4–5 (both of which invoke the standard set forth in *Burroughs Wellcome Co. v. Barr Labs., Inc.*, 40 F.3d 1223, 1228 (Fed. Cir.1994)). The inventor in patent law is the person who conceived the patented invention. *Burroughs*, 40 F.3d at 1228 (citing *Sewall v. Walters*, 21 F.3d 411, 415 (Fed.Cir.1994)). Conception, in turn, "is the formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice." *Id.* (citing *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1376 (Fed.Cir. 1986) and *Sewall* at 415).

Conception is complete only when the idea is so clearly defined in the inventor's mind that only ordinary skill would be necessary to reduce the invention to practice, without extensive research or experimentation. *Burroughs*, at 1228 (citing *Sewall* and *Coleman v. Dines*, 754 F.2d 353, 359 (Fed.Cir.1985)). Because it is a mental act, courts require corroborating evidence of the invention that would enable one skilled in the art to make the invention. *Id.* (citing *Coleman* at 359).

Thus, the test for conception is whether the inventor had an idea that was definite and permanent enough that one skilled in the art could understand the invention; the inventor must prove his conception by corroborating evidence, preferably by showing a contemporaneous disclosure. An idea is definite and permanent when the inventor has a specific, settled idea, a particular solution to the problem at hand, not just a general goal or research plan he hopes to pursue. *See Fiers v. Revel*, 984 F.2d 1164, 1169 (Fed.Cir.1993); *Amgen, Inc. v. Chugai Pharmaceutical Co.*, 927 F.2d 1200, 1206 (Fed.Cir.1991)(no conception of chemical compound based solely on its biological activity). The conception analysis necessarily turns on the inventor's ability to describe his invention with particularity. Until he can do so, he cannot prove possession of the complete mental picture of the invention. These rules ensure that patent rights attach only when an idea is so far developed that the inventor can point to a definite, particular invention.

*Burroughs*, 40 F.3d at 1228.[6]

The disputes over the issue of conception in the instant case, as they have devel-

---

**6.** In *Burroughs*, the Federal Circuit applied this standard to find that pharmaceutical company scientists conceived of, and were therefore properly named as inventors on six patents, various methodologies for using AZT in the treatment of HIV notwithstanding the fact that the efficacy of the conception could not be tested, or "reduced to practice," without the complex experimental skills and facilities available only at the National Institute of Health (NIH). The Court rejected the asser-

tion of alleged infringer companies that the NIH scientists must be named coinventors under the doctrine of "simultaneous conception and reduction to practice" articulated by the Court in *Smith v. Bousquet*, 27 C.C.P.A. 1136, 111 F.2d 157 (1940)(in the "unpredictable" and experimental sciences of chemistry and biology, in particular the uncertain relationship between chemical structure and biological activity, Court declined to find concep-

oped on remand, are two-fold. The first involves the nature and scope of the technology patented and the distinction, urged by Cyanamid, between the Materna reformulation ideas developed in Studies II and IIA and described by Dr. Allen in his December 1979 and March 1980 letters and the "much broader" claims of the '634 Patent. *See* Def.'s Br. in Opp. at 4 & 13 (asserting there is "[n]o concept more fundamental to patent law ... than that 'the claims of a patent ... are the sole measure of the patent grant ....' ")(quoting *Bandag, Inc. v. Al Bolser's Tire Stores, Inc.*, 750 F.2d 903, 922 (Fed.Cir.1984)). Cyanamid argues the Doctors cannot be *sole* inventors of these broader claims because Studies IA, II and IIA (and the 1979 and 1980 letters written by Dr. Allen) contemplated the use of different, and more restricted, quantities of calcium and magnesium oxide than the range patented by Cyanamid. Defs.' Br. at 6. At most, according to Cyanamid, the Doctors' work was merely part of, or contributed to, the broader subject matter conceived of by Dr. Ellenbogan such that the Doctors could be considered no more than "joint" inventors, if anything, with him on the '634 Patent. *Id.* at 14 (citing *Ethicon, Inc. v. United States Surgical Corp.*, 135 F.3d 1456, 1460 (Fed.Cir.1998)(citing 35 U.S.C. § 116)).

The second dispute flows from the first and involves the existence and sufficiency of any contemporaneous or other corroborating evidence to support the Doctors' claims of inventorship. Cyanamid contends the only proper corroborative evidence is that involving a contemporaneous disclosure, and denies Plaintiffs have any such evidence. According to Cyanamid, Plaintiffs' reliance on the trial record to satisfy federal patent law's corroboration requirement "perpetuat[es]" the flaw of ignoring the claims of the '634 Patent by analyzing inventorship "as if the only issue to be considered is 'who invented reformulated Materna.' " Defs.' Br. at 13. Because "none" of Plaintiffs' evidence qualifies as corroboration of the "broader" claims of the patent, Cyanamid contends the Doctors cannot, as a matter of federal patent law, overcome the "presumption of correctness" of the named inventor on the Patent and cannot, therefore, be "inventors" of the patented technology.

Cyanamid's arguments rest on three critical presuppositions: (1) that the claims of the '634 Patent are, in fact, "broader" than, or different from, the idea or concept the Doctors claim to have invented (which Cyanamid contends is limited to the 250 mg/25 mg composition of calcium carbonate and magnesium oxide in Reformulation B); (2) that the University's evidence actually is improper and insufficient to overcome the '634 Patent's "presumption of correctness"; and (3) that Cyanamid, by contrast, has come forward with proper and adequate corroborative evidence proving inventorship on the part of Dr. Ellenbogen. Not one of these premises survives rumination.

tion until the invention had been reduced to practice via experimentation). The Court explained that the rule in *Smith* was not absolute, and did not stand for the proposition that an inventor can "never" conceive an invention in an unpredictable or experimental field until reduction to practice. *Burroughs,* 40 F.3d at 1229. A conception is incomplete until reduction to practice in such a field "only if the subsequent course of experimentation, especially experimental failures, reveals uncertainty that so undermines the specificity of the inventor's idea that it is not yet a definite and permanent reflection of the complete invention as it will be used in practice." *Id.* (citing *Amgen* at 1207). In all other cases, the successful reduction to practice serves to *corroborate* what is already a complete concept, not finalize an indefinite one. *Id.*

I note that *Burroughs* has been criticized as an attempt to fit the facts surrounding the invention of AZT into the confines of a traditional, and outdated, definition of conception, resulting in a decision incongruous with *Smith* and its progeny when the subject matter of an invention, i.e., biotechnology, "may very well [and should] influence the issue of conception." *See also* Monheit, *supra,* at 200. The criticism, and my notice of it, is merely academic as neither side raises the principle of simultaneous conception and reduction as affecting the question of inventorship in this case.

Cyanamid's position on the scope of the patent claims is a marvel of denial and contrivance. Perhaps it is better described as the proverbial straw man. The Doctors have always maintained they are the true inventors of the invention claimed by Dr. Ellenbogen, i.e. the complete subject matter of the '634 Patent, and have never limited their claim to the 250/25 composition of reformulated Materna. A comparison of Cyanamid's 1981 patent application (Ex. 234) with the Doctors' 1981 New England Journal of Medicine article manuscript (Ex. 149), moreover, reveals that the scope of the patent claims is *precisely* that of the Doctors' Article. The patent application, quite simply, is derived virtually wholesale from the Article.

In the patent application, for example, Cyanamid summarized the invention as follows:

> This invention relates to multi-mineral, dietary supplement composition for the treatment of iron deficiency anemia which provide enhanced levels of iron bio-availability. This is achieved by the use of controlled levels of oxides and carbonates of coadministered minerals, such as calcium and magnesium .... [e]specially useful in prenatal therapy.

Patent Application (Tr. Ex. 234, p. 1). In describing the invention, Cyanamid continues:

> One of the most common causes of iron-deficiency anemia is that associated with pregnancy. During pregnancy and lactation, it is common to supplement the body's enhanced need of iron, calci-

um, magnesium and other minerals ... via a prenatal multivitamin, multimineral dietary supplement.[7]

\*   \*   \*   \*   \*   \*

It has now been found that the bioavailability of an iron supplement can be enhanced by controlling the levels of the oxides and carbonates of minerals such as calcium and magnesium used in the mineral supplement compositions .... It has now been found that the combined quantities of oxides and carbonates of the minerals coadministered with the iron play a substantial role in the bioavailability of the iron component and that the control of the upper limit of the combined quantities enhances the absorption of the iron supplement. Calcium and magnesium present principle problems in that magnesium is commonly employed in the form of magnesium oxide and calcium is commonly employed in the form of calcium carbonate.[8]

*Id.* at p. 2.

As the basis for these "findings," Cyanamid uses an almost verbatim recitation of the "Methods" section of the Article. *Compare* Patent App. at p. 5 *with* Article at p. 5 (describing Studies I–IV, how "venous blood samples" from "15 to 24 subjects" were "collected by hypodermic syringe," "clotted at room temperature," and "centrifuged at 4,000 g for 30 minutes at 4°C to isolate the serum which is removed and stored at –20°C" and how the subjects were "healthy menstruating female volun-

---

7. From the Introduction of the Article:

The recommended dietary allowance for many vitamins and mineral are increased for pregnant women .... Because the absorption of dietary iron is barely sufficient to compensate for normal external blood loss, the additional ... iron that must be absorbed daily throughout pregnancy must come from iron supplements.

8. From pp. 7 and 8 of the Article:

[In] Study II ... we ... found significant (P<0.05) inhibition of iron absorption with calcium carbonate and magnesium oxide, and that the inhibitory effects of calcium

carbonate and magnesium oxide were additive .... [In] Study III[IIA], [our] findings support[ed] our previous observation that calcium carbonate and magnesium oxide are responsible ... for the decreased iron absorption observed with the original formulation of Materna [and] *indicate that prenatal mulvitamin[sic]-mineral supplements can be formulated in a way [referencing the reductions in amounts of magnesium oxide and/or calcium carbonate used in the Materna reformulations tested in Study III] that results in values for iron absorption that are above the recommended mean value of 3.5 mg per day for pregnancy.* (Emphasis added.)

teers 21 to 45 years of age" with "normal hemoglobin and hematocrit valves" who had "fasted overnight"). Most significant, for our present purpose, is the inclusion and incorporation, into the application, of Table I and Figures 1–4 from the Article,[9] and the wholesale adoption of the "Results" section of the Article. *Compare* Patent App. at pp. 8–9 *with* "Results" section of Article, at pp. 6–8 (describing, in precisely the same narrative form, the chemical compounds, formulations and reformulations studied and the results of each of the Studies I—IV).

The support for, and entire basis of, the discoveries credited in the patent application to Dr. Ellenbogen are Studies I—IV and their results as described by the Doctors in the text of their Article and as summarized by the Doctors in Table I and Figures 1–4. Cyanamid's attempt, in its briefs, to distinguish the patent claims from the breadth and scope of the Article range from the generally unpersuasive to the blatantly disingenuous. Referencing Dr. Allen's statement in his September 1979 letter that "iron absorption from prenatal capsules could be increased markedly if ... the amount of magnesium oxide was reduced or omitted entirely," for example, Cyanamid, in almost unctuous terms, states Dr. Ellenbogen, "unlike Dr. Allen ... recognized the importance of magnesium for pregnant women, causing him to reject Dr. Allen's suggested elimination of magnesium oxide." Defs.' Br. in Opp. at p. 12. As a initial matter, Dr. Allen's letter does not "suggest" the elimination of magnesium oxide. It simply confirms what is the essence of the invention patented, namely, that iron absorption is enhanced the more the amounts of absorption-inhibiting mineral salts like calcium carbonate and magnesium oxide are reduced. And most telling, for present purposes, is Cyanamid's wholesale adoption of Dr. Allen's position in the patent application where, at page three, Cyanamid writes:

> While calcium and magnesium are almost always present in multi-mineral compositions, especially in the case of prenatal compositions, they are less necessary from a dietary supplement point of view in that adequate quantities of each can be maintained through proper diet. In contrast, however, prenatal supplementation of iron is very important.
>
> *Accordingly, in the compositions of the present invention, the quantities of calcium and magnesium can be reduced to zero.*

(Ex. 234 at p. 3) (emphasis added). This statement belies any great "recognition" Dr. Ellenbogen had of the "importance of magnesium for pregnant women," or, if he indeed had such a recognition, causes one to wonder why he would phrase his patent claims as he did.

Because the ranges of the compositions reflected in the patent claims are identical to and based exclusively on the ranges of compositions tested and discussed in the Article, the assertion that the patent claims are somehow "broader" or "other than" those described by the Doctors is rejected.

9. The completeness, and obviousness, of the wholesale lifting of the Doctors' work in Table I and Figures 1–4 cannot be overstated. The clear and convincing weight of the evidence supports a finding that not only is Table I a replication of Table I in the Doctors' Article, but it is an actual photocopy of the Table. Dr. Allen testified in detail, and the face of the document bears out, that Cyanamid actually cut Table I out of the Article manuscript, cut and trimmed along the length of the columns to remove excess space between them, deleted references to "Stuartnatal," "Materna" and other name brands of supplements and re-typed them as acronyms or other shortened forms, trimmed away the footnotes, pasted the table back together again and photocopied it into the application. *Cyanamid I* at 1400–01; *Cyanamid III* at 1348; *see* Dr. Allen's testimony, Trial Tr. at pp. 449:13—453:9 (noting different typeface and left justification of retyped words and acronyms, gaps and breaks where the line running across the columns was cut and numerous other indications that, together with the patent application itself, clearly and convincingly supported a finding of photocopying).

In a tacit acknowledgment of this, Cyanamid next argues that the ideas for the processes and reformulations tested in Studies II, IIA and III, were actually Dr. Ellenbogen's, not the Doctors', such that copying the Article into the patent application was really copying Dr. Ellenbogen's own invention. To make this argument, Cyanamid focuses on Dr. Allen's 1979 and 1980 letters, suggesting that the Doctors, at both times, were on the wrong track and were corrected, in their concept and design, by Dr. Ellenbogen.

Cyanamid first points to the suggestion in Dr. Allen's post-Study II December 1979 letter that iron absorption "could be increased markedly if calcium sulfate were used in place of carbonate." Because Study III did not follow this suggestion, and used reformulations of Materna that continued to use calcium carbonate, rather than calcium sulfate, Cyanamid contends "the only reasonable inference to be drawn ... is that the conception of reformulating Materna with reduced amounts of calcium carbonate and magnesium oxide originated with Dr. Ellenbogen." Absolutely not.

The full context of Dr. Allen's 1979 letter reveals that the Doctors had learned that both the calcium carbonate and the magnesium oxide in Materna inhibited the absorption of iron, while the calcium sulfate in Stuartnatal did not. In this greater context, and as corroborated by the testimony and other evidence presented at trial, it is clear that Dr. Allen knew both that reformulating Materna with reduced amounts of calcium carbonate and magnesium oxide would enhance absorption, and also knew that replacing calcium carbonate with calcium sulfate would do so even more effectively. The simple fact, however, was that the makers of Stuartnatal, the entity whose claims of superior iron absorption were the impetus for the Studies in the first instance, used calcium sulfate in their competing product, and Cyanamid did not want to reformulate its Materna

brand to concede this in any way. So the Doctors dropped the calcium sulfate reformulation, as a concession to the marketing needs and desires of Cyanamid. This neither establishes that the Doctors' concept was somehow limited to reformulations using calcium sulfate nor does it refute, by implication, that it was the Doctors who came up with the idea of achieving enhanced absorption with reformulations that retained the use of calcium carbonate. And it certainly does not establish, by some kind of negative inference, that the ideas, from the outset, were Dr. Ellenbogen's.

Cyanamid also attempts to attach dispositive meaning to the fact that Dr. Allen's March 1980 letter, written to report the results of Study IIA, suggested a 200mg/25mg calcium carbonate/magnesium oxide reformulation of Materna when Study III went ahead using a 250 mg/25 mg reformulation instead. Cyanamid, again, contends the only reasonable inference to be drawn from this is that Dr. Ellenbogen came up with the idea for reformulated Materna, because 250/25 was the formulation ultimately adopted for new Materna. Not only does that inference not necessarily follow, but the fact it is intended to establish, even if true, is immaterial.

The essence of the invention is not, as Cyanamid itself has argued, the specific formulation of 250 mg of calcium carbonate and 25 mg magnesium oxide.[10] Its essence is the idea patented, and reflected in Dr. Allen's 1979 and 1980 letters as well as the Article, that calcium carbonate and magnesium oxide inhibit iron absorption from prenatal supplements and their reduction, in a range from 350 mg/25 mg to zero, will improve iron absorption over original Materna to levels approaching, then exceeding, the 3.5 mg recommended for pregnant women and, at the 200 mg/0mg range, should approach absorption rates approaching that for iron ingested

---

10. This, I note, completely contradicts Cyanamid's argument above that the essence of the invention is "much broader" than the specific

iron/calcium carbonate/magnesium oxide formulation sold as reformulated Materna.

alone. The fact reformulated Materna used 250 mg of calcium rather than the 200 mg recommended by Dr. Allen in his March 1980 letter in no way disproves that he, together with Dr. Seligman, came up with the idea, tested in Study IIA, that reducing the combined amounts of calcium carbonate and magnesium oxide from the 350 mg and 100 mg included in original Materna to the threshold level of inhibition generally and then to zero, would improve iron absorption in amounts directly related to the level of the reduction. Thus, the fact that Reformulation B used a lesser reduction than the reduction suggested by Dr. Allen in his letter is largely immaterial. What is salient is that both were reductions, and the idea that all levels of reductions from the 350/100 formulation of original Materna would increase iron absorption for pregnant women was the Doctors', not Dr. Ellenbogen's.

Finally, I note that the weight of the evidence at trial contravened any suggestion by Cyanamid, then or now, that the decisions to use calcium carbonate, rather than sulfate, or 250 mg of carbonate rather than the 200 mg threshold level suggested by Dr. Allen, were based on any scientific conception or know-how of Dr. Ellenbogen. To the contrary, the evidence at trial established, clearly and convincingly, that these decisions were precipitated by marketing considerations and Cyanamid's desire to distance itself from, and obtain marketing advantage over, the makers of Stuartnatal. Cyanamid not only rejected a reformulation of Materna that would make it more like Stuartnatal, it actively sought a reformulation that allowed it to represent that Materna provided more calcium than the 200 mg of calcium sulfate provided in a dose of Stuartnatal. As Cyanamid itself set forth in the patent application,

> [T]he invention is not limited to the materials [sulfate or carbonate], proportions [250 mg or 200 mg], methods and the like specifically described and exemplified [in Table I] below, *which can be modified without departing from the scope of the invention.* (Ex. 234 at p. 4) (emphasis added).

Dr. Allen knew that. It was his idea. And that is why there is nothing salient or dispositive in either Dr. Allen's 1979 or 1980 letters suggesting a switch to calcium sulfate or a reformulation using 200, rather than 250, mg of calcium carbonate. (Both of these, I note, would have provided even greater absorption of iron according to the invention patented by Cyanamid than did the actual reformulation of Materna sold under the Patent).

## C. *Specific Findings Regarding Inventorship*

■ Based on the foregoing, and in accordance with the Federal Circuit's mandate, I make the following findings of fact and conclusions of law on the issue of inventorship. In making these findings, I apply the federal patent standard for inventorship set forth in *Burroughs.*

1. The essence of the patented invention is that (1) large amounts of calcium carbonate and magnesium oxide, both of which are present in most prenatal multivitamin-mineral supplements, inhibit the absorption of iron, and their inhibitory effects are additive; and (2) iron absorption from prenatal multivitamin/mineral supplements may be enhanced by decreasing the total amounts of these calcium and magnesium salts in ranges suggested by the results of Studies III and IV as set forth in Table I (i.e., from a high of 350 mg of calcium carbonate and 25 mg of magnesium oxide that achieved absorption in the amount 3.0 mg of iron per day, to amounts like 250 mg of calcium carbonate and 25 mg of magnesium oxide present in Reformulation B or that achieve absorption above the recommended value of 3.5 mg of iron per day).

2. Doctors Allen and Seligman, not Dr. Ellenbogen, invented the subject matter of the '634 Patent. It was the Doctors, not Dr. Ellenbogen, who conceived of the invention ultimately patented by Cyanamid.

a. It was the Doctors who, in late 1979, conceived of and tested the idea that calcium carbonate and magnesium oxide inhibited iron absorption in prenatal multivitamin/mineral supplements (Studies IA and II) and conceived of and tested the idea that reducing those components would improve iron absorption in pregnant women (Study II). It was the Doctors who, in early 1980, then conceived of and designed a test for identifying the ranges and types of reductions that would allow iron absorption in amounts approaching, and then exceeding, the 3.5 mg per day recommended for pregnant women (Study IIA, as confirmed and honed in Studies III and IV).

b. These ideas were more than a general goal or research plan: They were specific and settled solutions to the particular problem at hand, which was the inadequacy of either original Materna or Stuartnatal to allow adequate iron to be absorbed from supplements intended to supply it. The ideas were definite and permanent enough at the time Studies II and IIA were completed that those skilled in the arts of pharmacology or biomedical research could understand them and replicate the studies on which they were based.

c. The Doctors described their invention with particularity, both in the greater context of Dr. Allen's December 1979 and March 1980 letters and in their 1981 New England Journal of Medicine article manuscript, which formed the basis, entirely, for the 1981 patent application and the resulting '634 Patent.

d. The 1979 and 1980 letters, the Article describing Studies I—IV and copied by Cyanamid into the patent application, viewed in the context of the respective conduct of the parties during the relevant time period and at trial, constitute corroborating evidence of this conception. I reject Cyanamid's contention that the only competent corroboration is that provided by contemporaneous disclosures, but even so find that the 1979 and 1980 letters are such disclosures. I specifically find that Cyanamid has not, and cannot, provide any evidence, other than the testimony of Dr. Ellenbogen, to corroborate its claims of conception, and repeat, in the strongest of terms, that I did not believe Dr. Ellenbogen at trial and continue to disbelieve him now. My review of the testimony at trial and reconsideration of all the evidence in light of the post-trial briefs and arguments serves to intensify my finding that Dr. Ellenbogen is utterly lacking in credibility.

3. I further reject Cyanamid's contention that the "presumption of correctness" to which issued patents are entitled has not been overcome by the evidence presented by Plaintiffs. Cyanamid argues that "proven misconduct by Dr. Ellenbogen" cannot corroborate the inventorship claim of the Doctors because Plaintiffs cannot satisfy their burden of proof by casting doubt on Cyanamid's evidence. I do not rely on my findings regarding Dr. Ellenbogen's misconduct and lack of credibility as "corroboration" of the Doctors' inventorship. I rely on those findings to reject the only evidence offered by Cyanamid to refute the Doctors' other corroborating evidence, namely, the course of the Studies, the 1979 and 1980 letters of Dr. Allen, the Article manuscript, and Cyanamid's copying thereof into the patent application.

Cyanamid has no other evidence besides the testimony of Dr. Ellenbogen either to refute Plaintiffs' evidence or to prove that Dr. Ellenbogen, in fact, conceived of the patented invention. I found Dr. Ellenbogen's testimony lacking in credibility based on my careful consideration of his demeanor on the witness stand and the substance of his testimony on direct and cross-examination. I found Dr. Ellenbogen misrepresented to Dr. Raymond and to Cyanamid generally his role in the Studies and in their design, and in the design and

conception of the invention ultimately patented. I drew a negative inference from the destruction, or "misplacement," of the copies of the Record of Invention that were supposed to have been kept for the life of the patent but which were not. These findings, together, do more than "cast doubt on Cyanamid's evidence." They refute, entirely, the only evidence Cyanamid has either to support its claims of inventorship or to refute the substantial corroborative evidence presented by the University and Doctors Allen and Seligman.

4. I reject Cyanamid's assertion, in the alternative, that the Doctors were joint inventors with Dr. Ellenbogen of the patented invention. The definite and permanent idea of the complete and final invention was exclusively that of the Doctors, and they are the true and sole inventors of the subject matter of the '634 Patent.

## V. RECONSIDERATION OF PLAINTIFFS' CLAIMS IN LIGHT OF THE NEW INVENTORSHIP DETERMINATION

Having determined that the Doctors were the true and sole inventors of the subject matter of the '634 Patent, I reconsider Plaintiffs' specific claims in accordance with the Federal Circuit's mandate and opinion.

### A. Fraud and Unjust Enrichment

#### Fraud

■ As set forth above, the finding that the Doctors invented the subject matter of the '634 Patent is dispositive of Plaintiffs' fraud claim on remand. Having made the determination that the Doctors were the true and sole inventors of the matters patented, I now reiterate that this gave rise to a duty on the part of Cyanamid to disclose the filing of the patent application to the Doctors; that Cyanamid failed so to disclose; that the Doctors act-ed on this concealment by continuing to work for and to benefit Cyanamid, unaware that their ideas had been appropriated and that Cyanamid was trying to exclude them and others from the benefits of their ideas in the future, and by failing to seek to have their names included in the application or to prevent the issuance of the patent in Dr. Ellenbogen's name; and that both they [11] and the University were injured thereby. *See Cyanamid,* 196 F.3d at 1373–74, *Cyanamid III,* 974 F.Supp. at 1353. I also reiterate my finding that the conduct of Dr. Ellenbogen and Cyanamid in betraying the Doctors' trust, exploiting their work, and thwarting their intent that their discovery inure to the benefit of the public generally, and not just to Cyanamid, was attended by circumstances of fraud, malice, and willful and wanton misconduct for purposes of Colo.Rev.Stat. § 13–21–102(1)(a).

The more difficult issue, on remand, is the nature and amount of actual damages to be awarded on the reentered judgment against Cyanamid on Plaintiffs' fraud claims. The Federal Circuit's directive is that Cyanamid may only be held liable "for the payment that Cyanamid would have made to secure the Doctors' cooperation in filing the required documents with the PTO, an assignment of ownership rights and/or an exclusive license from the University." 196 F.3d at 1374. In setting the amount of damages, I am to consider the "usual and customary arrangements at the time of the filing of the patent application," bearing in mind "that university licensing barely existed as of the filing date of the '634 patent in [December] 1981." *Id.*

After consideration of the parties' respective arguments in their briefs, I have determined that all issues of damages should be reopened and the parties afforded an opportunity to present additional evidence on the issue of actual damages

11. Specifically, I find the Doctors individually suffered loss because they were deprived of an opportunity to prevent the patenting of their invention and because they were de-prived of any payment or other tangible benefits they may have been offered to secure their cooperation in filing the required documents with the PTO.

and related equitable remedies to be awarded Plaintiffs and on the issue of punitive damages to be awarded to the Doctors. Both parties will be permitted to introduce new damages evidence and, if necessary, to conduct specific and limited discovery on these issues before trial. The nature and scope of the issues, and any discovery necessary to develop them, are issues that will be addressed in a combined scheduling/trial preparation conference to be set by separate order.

### Unjust Enrichment

■ Because, like fraud, Plaintiffs' unjust enrichment claim "hinges" on the finding that the Doctors invented the subject matter of the '634 Patent, my findings above allow for the reinstatement of my conclusion in *Cyanamid III* that Cyanamid was unjustly enriched by its appropriation of the Doctors' invention and is liable to the University therefor in equity. 196 F.3d at 1374. As the Federal Circuit noted, Cyanamid, on appeal, did not raise any issues with regard to my findings under the unjust enrichment analysis, and I again conclude that a benefit was conferred on Cyanamid by the Plaintiffs under circumstances that make its retention, without compensation, inequitable.

While I addressed Cyanamid's affirmative defenses at length in *Cyanamid III*, Cyanamid again raises the Restatement of Restitution on remand to argue no claim for unjust enrichment can be sustained under any finding of inventorship, because the Doctors "freely conveyed" the results of the reformulation studies to Cyanamid, "without restriction of any kind, but with the expectation that Cyanamid would use the information for its commercial benefit." Defs.' Mem. Law at 20. While this statement is true, it underscores a continuing and fundamental misapprehension of law on the part of Cyanamid by Cyanamid that goes to the heart of the issues in this case.

The unfair and unauthorized benefit secured by Cyanamid was *not* its use and manufacture of reformulated Materna, but the *right to exclude*—through exercise of federal patent rights—generic drug companies, doctors, nutritionists and, ultimately, large numbers of pregnant women, from also benefitting from their work. *See Cyanamid III* at 1354–56 ("Cyanamid did much more than simply use and market an idea that was in the public domain: Cyanamid patented it .... In doing so, [Cyanamid] removed the reformulation from the free marketplace of ideas in direct contravention of those who invented it.") Cyanamid, in fact, thwarted what the Doctors intended "freely" to convey, and that is a complete and definite research-based idea for reformulating prenatal supplements that would inure to the benefit of all of these, and not just Cyanamid. *See* (Ex. 79)(Dr. Allen's 1979 letter expressing his belief that a prenatal capsule reformulated as suggested by his research "would be of definite benefit to pregnant women *and would also benefit* [Cyanamid] since its share of the prenatal market should increase dramatically").

Again, what is interesting on remand is not the judgment of liability in favor of Plaintiffs—which I reiterate—but the nature and scope of the remedy to be awarded. In *Cyanamid III*, I did not award any additional monies or compensation to Plaintiffs on their unjust enrichment claim because I found that the University's loss and Cyanamid's gain coincided. The benefit to be disgorged (Cyanamid's post-Patent profits gained as a result of having the Patent) was the same as the damages originally awarded for fraud. 974 F.Supp. at 1358–59. Under these circumstances, I concluded, there was no basis upon which to award the University a share of Cyanamid's post-Patent profits over and above the 1981 value of the stolen idea. *Id.* at 1359.

The Federal Circuit did not address my disgorgement analysis, but clearly its shape is altered by the Court's rulings regarding the nature of the Plaintiffs' loss. Under the Federal Circuit's analysis, and because the Doctors intended to, and did, freely share their research results to allow

Cyanamid to make and sell a reformulated Materna, the only financial opportunity that the University could have lost was the payment for an assignment of ownership rights in the '634 Patent or a license from the University to sell the reformulated product. 196 F.3d at 1373. Viewed in this light, the University's recoverable damages may be significantly less than the unfair benefit gained by Cyanamid or, perhaps, as Cyanamid will undoubtedly argue, they still coincide. The question of the proper amount, if any, Cyanamid should be required as a matter of equity to disgorge is one that will be decided in the proceedings related to the limited retrial on damages issues referenced above.

## B. *Section 256 and Equitable Title*

The Patent Act requires that an applicant for a patent disclose the names of all inventor(s) of the subject matter of the invention to be patented. 35 U.S.C. §§ 111, 115–16 (1994). The Act also authorizes correction of the inventor(s)' names in applications, 35 U.S.C. § 116, and in patents, 35 U.S.C. §§ 256. Section 256 permits correction by application to the Commissioner or in federal court:

§ 256. Correction of named inventor.

Whenever through error a person is named in an issued patent as the inventor, or through error an inventor is not named in an issued patent and such error arose without any deceptive intention on his part, the Director may, on application of all the parties and assignees, with proof of the facts and such other requirements as may be imposed, issue a certificate correcting such error.

The error of omitting inventors or naming persons who are not inventors shall not invalidate the patent in which such error occurred if it can be corrected as provided in this section. The court before which such matter is called in question may order correction of the patent on notice and hearing of all parties concerned and the Director shall issue a certificate accordingly.

■ The Federal Circuit vacated my earlier grant of summary judgment in Cyanamid's favor on Plaintiffs' §§ 256 claim, relying on *Stark v. Advanced Magnetics,* 119 F.3d at 1555 (*Stark II* ) to conclude that the substitution in this case of the Doctors as named inventors would not invalidate the patent regardless of whether the misjoinder of Dr. Ellenbogen occurred as a result of deception or was simply an innocent mistake. *See* 196 F.3d at 1374–75. "[S]ection 256 allows complete substitution of inventors as long as the true inventors are without deceptive intent." *Stark II* at 1556. Pursuant to these authorities, and in accordance with the law of the case as determined by the Federal Circuit on appeal, I find the true inventors in this case to be without deceptive intent and order the correction of the '634 Patent at issue corrected to delete Dr. Ellenbogen as the inventor of the Patent's subject matter and to substitute for him the names of the true inventors, Drs. Robert H. Allen and Paul A. Seligman.

Also in accordance with the law of the case as determined by the Federal Circuit, I find and conclude that this substitution of the Doctors as named inventors under 35 U.S.C. § 256 establishes the University's equitable title to the '634 Patent. *See* 196 F.3d at 1375.

## VI. *CONCLUSION*

For the foregoing reasons, I hold that the Doctors are the true and sole inventors of the subject matter of the '634 Patent under federal patent standards, and that Cyanamid is liable to them and to the University on Plaintiffs' claims for fraud and unjust enrichment. Based on my findings and conclusions reiterated and supplemented herein, the punitive damages award of $500,000 each to Drs. Allen and Seligman is vacated, and a new amount will be assessed against Cyanamid in their favor. The nature and amount of Plaintiffs' actual damages under their fraud claim, and the nature and amount of any funds Cyanamid, as a matter of equity, should be ordered to disgorge, shall be determined after a retrial on the issue of

damages, to be set forthwith by separate order.

Further, and as the true and sole inventors whose nonjoinder in the '634 Patent was not the result of any fraud or deceptive intent on their part, Plaintiffs are also entitled to judgment on their claim for correction of the Patent under 35 U.S.C. § 256 as well as on their claim for equitable title. The Director of the Patent and Trademark Office shall issue a certificate correcting the '634 Patent to delete Dr. Leon Ellenbogen as the inventor of the Patent's subject matter and to substitute for him the true inventors Dr. Robert H. Allen and Dr. Paul A. Seligman.

IT IS SO ORDERED.

TOOSOX

# APPENDIX 1

## TABLE I

### SUMMARY OF IRON FORMULATIONS AND IRON ABSORPTION IN VARIOUS EXPERIMENTS

| Iron Preparation | Amount of iron Ingested (mg) | Form and amount of calcium and magnesium present or (added) at the time of ingestion | | | | Calculated mean values for iron absorption in various studies | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Calcium sulfate (mg) | Calcium carbonate (mg) | Magnesium oxide (mg) | Magnesium hydroxide (mg) | Study I (mg) | Study II (mg) | Study III (mg) | Study IV (mg) | Average (mg) |
| Ferrous fumarate | 65 | - | - | - | - | 8.0 | 9.0 | - | 7.3 | 8.1 |
| ST | 65 | 200 | - | 100 | - | 2.0 | - | 1.3 | 2.2 | 1.8 |
| MO | 60 | - | 350 | 100 | - | 2.8 | - | - | - | |
| Ferrous fumarate | 65 | (200) | (350) | - | - | - | 9.5 | - | - | |
| Ferrous fumarate | 65 | - | - | (100) | - | - | 6.8 | - | - | |
| Ferrous fumarate | 65 | - | - | (100) | - | - | 6.6 | - | - | |
| Ferrous fumarate | 65 | (200) | - | (100) | - | - | 6.2 | - | - | |
| Ferrous fumarate | 65 | - | (350) | (100) | - | - | 4.3 | - | - | |
| New Formulation A | 60 | - | 350 | 25 | - | - | - | 3.0 | - | |
| New Formulation B | 60 | - | 250 | 25 | - | - | - | 5.0 | 4.1 | 4.5 |
| NL | 60 | - | 200 | - | 100 | - | - | - | 2.4 | 3.0 |
| NF | 65 | - | 350 | 100 | - | - | - | - | 3.0 | |

## FIGURE 1

## FIGURE 2

## FIGURE 3

## FIGURE 4

# APPENDIX 2

## TABLE I

SUMMARY OF IRON FORMULATIONS AND IRON ABSORPTION IN VARIOUS EXPERIMENTS

| Iron Preparation | Amount of iron Ingested (mg)[a] | Form and amount of calcium and magnesium present or (added) at the time of ingestion | | | | Calculated mean values for iron absorption in various studies | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Calcium sulfate (mg)[a] | Calcium carbonate (mg)[a] | Magnesium oxide (mg)[a] | Magnesium hydroxide (mg)[a] | Study I (mg) | Study II (mg) | Study III (mg) | Study IV (mg) | Average (mg) |
| Ferrous fumarate | 65 | - | - | - | - | 8.0 | 9.0 | - | 7.3 | 8.1 |
| Stuartnatal | 65 | 200 | - | 100 | - | 2.0$^b$ | - | 1.3$^d$ | 2.2$^b$ | 1.6 |
| Materna-original | 60 | - | 350 | 100 | - | 2.8$^b$ | - | - | - | |
| Ferrous fumarate | 65 | (200) | - | - | - | - | 9.5 | - | - | |
| Ferrous fumarate | 65 | - | (350) | (100) | - | - | 6.8$^b$ | - | - | |
| Ferrous fumarate | 65 | - | - | (100) | - | - | 6.6$^b$ | - | - | |
| Ferrous fumarate | 65 | (200) | - | (100) | - | - | 6.2$^b$ | - | - | |
| Ferrous fumarate | 65 | - | (350) | (100) | - | - | 4.3$^{bc}$ | - | - | |
| Materna-reformulation A | 60 | - | 350 | 25 | - | - | - | 3.0$^d$ | - | |
| Materna-reformulation B | 60 | - | 250 | 25 | - | - | - | 5.0$^d$ | 4.1$^{be}$ | 4.5 |
| Natalins | 60 | - | 200 | - | 100 | - | - | - | 2.4$^b$ | |
| Natafort | 65 | - | 350 | 100 | - | - | - | - | 3.0$^b$ | |

a — refers to the weight of elemental iron, calcium or magnesium and not to the weight of the entire salt. Iron is present in the form of ferrous fumarate in all of the prenatal multivitamin-mineral pills.

b — P<0.05 when compared to iron alone.

c — P<0.05 when compared to iron + calcium carbonate and iron + magnesium oxide.

d — P<0.05 when any one is compared to either of the other two.

e — P<0.05 when compared to Stuartnatal or Natalins.

FIGURE 1

FIGURE 2

FIGURE 3

FIGURE 4