Jeffrey R. **SEWALL** and Ronald G. Walters, Appellants,

v.

Ronald G. **WALTERS**, Appellee.

No. 93–1230.

United States Court of Appeals, Federal Circuit.

April 7, 1994.

Rehearing Denied May 19, 1994.

Daniel W. McDonald, Merchant, Gould, Smith, Edell, Welter & Schmidt, P.A., Minneapolis, MN, argued for appellants.

James P. O'Shaughnessy, Foley & Lardner, Milwaukee, WI, argued for appellee. With him on the brief was E. John Brzytwa, Cavitch, Familo & Durkin Co., L.P.A., Cleveland, OH.

Before ARCHER, Chief Judge,* RICH, Circuit Judge, and LAY, Senior Circuit Judge.**

RICH, Circuit Judge.

Sewall, et. al. (Sewall) appeals from the December 11, 1992, decision of the Board of Patent Appeals and Interferences (Board) of the United States Patent and Trademark Office (PTO), awarding the subject matter of the sole count in issue to Ronald G. Walters on the basis that he is the sole inventor of that subject matter. Consistent with our discussion below, we *affirm.*

## I. BACKGROUND

### A. *The Count*

The count is directed to an apparatus for back projecting data provided by a computer tomography (CT) scanner or other object image scanner into an image matrix location.[1] The count reads:

> An apparatus for back projecting data provided by a CT scanner or other object image scanner into an image matrix location, wherein the data are associated with

a particular view of a test subject, comprising:

> a. a projection data memory means for storing projection data;
>
> b. a linearization pointer memory means for storing a set of projection data memory pointers;
>
> c. scaling means operatively connected to the linearization pointer memory means for selecting a member of the set of projection data memory pointers;
>
> d. means operatively connected to the scaling means and the projection data memory means for determining, based on the selected projection data memory pointer, the projection data associated with the image matrix location; and
>
> e. means operatively connected to the determining means for accumulating the projection data associated with the image matrix location.

The apparatus recited in the count is an improvement over the apparatus described and claimed in U.S. Patent No. 4,293,912 ('912 patent), issued to Walters on October 6, 1981. The improvement rests in the addition of element b, the "linearization pointer memory means for storing a set of projection data memory pointers." The linearization pointer memory means compensates for distortion in the raw data received by the CT scanner.

■ At the time here involved, Walters was a consultant to Star Technologies, Inc. (Star), and Sewall was an employee of Star. On November 15, 1985, Star filed an application (Sewall application) containing claims corresponding to the subject matter of the count and naming Sewall and Walters as joint inventors. Star is the assignee of the Sewall application. Then, on February 1, 1988, Walters filed an identical application (Walter application), which is unassigned, asserting sole inventorship of that subject matter. This interference proceeding ensued, at which time the party Sewall, et. al. was designated senior party on the basis of their

---

* Judge Archer assumed the position of Chief Judge on March 18, 1994.

** The Honorable Donald P. Lay of the United States Court of Appeals for the Eighth Circuit sitting by designation.

1. *See In re Abele,* 684 F.2d 902, 214 USPQ 682 (CCPA 1982) (provides general background information regarding CT technology).

earlier filing date. However, the party Walters was, on motion, later given the benefit of the filing date of the Sewall application, wherefore neither party is in fact either senior or junior since both parties have the same filing date. The issue on appeal is merely one of joint or sole inventorship. As the original second to file, however, Walters had the burden to show his asserted sole inventorship.

### B. Development of Invention

Walters came up with the idea of adding element b to the apparatus described in his '912 patent sometime in late 1982 or early 1983. Around that time, Mr. Salquist of Star contacted Walters to discuss the possibility of Walters entering into a consulting relationship with Star to develop a medical imaging system. During one discussion, Walters disclosed to Salquist his idea for the back projecting apparatus recited in the count, including his idea of adding element b to the '912 apparatus. Salquist indicated interest in the proposed device, and this led to meetings between Walters and Mr. Cannon of Star. During one such meeting on April 22, 1983, Walters explained his back projecting apparatus to Cannon and scribbled notes on a copy of the '912 patent to illustrate his idea of modifying the '912 device through the addition of element b. To represent element b, Walters added a block to figure 6 of the '912 patent to connect block 114, a scaling means, to block 120, a projection data memory means for storing projection data. Walters explained at that time that element b would be a linearization table that would modify the addresses in the projection data memory of block 120 to accommodate any distortion in the projection data collected by the CT scanner.

The foregoing discussions led to a meeting on July 25, 1983, between Walters and Sewall, a chip designer with Star. During this meeting, Walters explained his proposed back projecting apparatus to Sewall, and Sewall took notes and marked up a copy of the '912 patent to indicate Walters' improvement over the '912 device. In August of 1983, Sewall wrote a summary of the discussions held during the July meeting, at Walters request, which confirmed that Walters came up with the idea of placing a linearization pointer memory means between blocks 114 and 120. Following this meeting, Walters undertook the responsibility of delivering to Star a design for a commercially functional back projecting apparatus. Sewall's part in this project was to implement Walters' design in chip form.

Prior to designing the hardware structure in detail, however, Walters believed it prudent to carry out a computer simulation of the proposed back projecting apparatus to ensure that it would function adequately. To this end, Walters independently wrote detailed register level specifications for conducting a complete computer simulation of the core elements of his back projecting apparatus and transmitted these specifications to Star to carry out the simulation. Walters intended that the register level specifications serve as a blueprint for the hardware. Accordingly, he instructed Star to adhere strictly to the protocols he had established and not make any functional revisions. In accordance with Walters' instructions, Star completed the computer simulation around April of 1984.

Sewall completed the design of the hardware structure following this successful simulation. In doing so, Sewall had no latitude to make any functional changes to the system that Walters had specified. The first prototype of the chip-based back projecting apparatus was completed at least as early as July of 1985, and Walters stated in his Preliminary Statement in the interference that the subject matter of the count was first reduced to practice at least as early as this date.

### C. Board Decision

The Board held that Walters' communication of his idea to Sewall on July 25, 1983, constituted a complete conception of the back projecting apparatus of the count. Consequently, the Board held that Walters was the sole inventor of that subject matter.

In reaching this conclusion, the Board stated that there was no evidence of record indicating that more than ordinary skill would have been needed to reduce to practice Walters' proposed back projecting apparatus

at the time he communicated his concept to Sewall. The Board found as a factual matter that, at the time that Walters communicated his concept to Sewall, the functions of element b were fully capable of being implemented by a programmer of ordinary skill in the art by programming a general purpose computer to perform the required mathematical functions or by a hardware designer by combining discrete, known elements such as adders, multipliers, etc., to perform these functions. The Board further noted that Sewall admitted that Walters conceived the mathematical algorithm underlying the apparatus of the count, including element b, and that Sewall had to follow that algorithm to develop the hardware architecture for the apparatus.

The Board went on to note that the count does not require the use of circuit chips such as those designed by Sewall. The Board further stated that, even if the count were so limited, there was no persuasive evidence that more than ordinary skill in the art would have been needed to implement Walters' concept in chip form.[2]

## II. ANALYSIS

### A. *Inventorship*

#### (1) *Applicable Law*

■ Determining "inventorship" is nothing more than determining who conceived the subject matter at issue, whether that subject matter is recited in a claim in an application or in a count in an interference. Conception, and consequently inventorship, are questions of law that this court reviews de novo; of course, any facts found by the Board in reaching an inventorship holding are reviewed for clear error. *Hybritech Inc.*

v. *Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1376, 231 USPQ 81, 87 (Fed.Cir.1986); *see also In re Caveney*, 761 F.2d 671, 674, 226 USPQ 1, 3 (Fed.Cir.1985) ("In appeals from PTO rejections, the Federal Circuit does not find facts de novo, but, instead, reviews PTO findings under the clearly erroneous standard.").

■ In this case, Sewall admits that he did not independently conceive the subject matter recited in the count. Instead, Sewall contends that he aided Walters in the conception of that subject matter, and therefore, that he is a joint inventor and should be designated as such pursuant to 35 U.S.C. § 116. This case therefore comes to us in the context of an originality contest as opposed to a priority contest. *Applegate v. Scherer*, 332 F.2d 571, 573 n. 1, 141 USPQ 796, 798 n. 1 (CCPA 1964) ("[I]n an originality case the issue is not who is the *first* or *prior* inventor, but who *made* the invention."). The "inventorship" issue to be decided is thus merely who conceived the invention for which patent protection is sought, and not who *first* conceived that invention.

■ Conception exists when a definite and permanent idea of an operative invention, including every feature of the subject matter sought to be patented, is known. *Coleman v. Dines*, 754 F.2d 353, 359, 224 USPQ 857, 862 (Fed.Cir.1985). Conception is complete when one of ordinary skill in the art could construct the apparatus without unduly extensive research or experimentation. *See Summers v. Vogel*, 332 F.2d 810, 816, 141 USPQ 816, 820 (CCPA 1964); *In re Tansel*, 253 F.2d 241, 243, 117 USPQ 188, 189 (CCPA 1958).[3]

---

2. Sewall quibbles that the Board used "would not have been obvious" language in its opinion and that, by doing so, the Board applied an improper standard. The language Sewall objects to is in the statement at page 7 of the Board's opinion which reads: "there is no evidence submitted by the party Sewall establishing that such chips [as Sewall designed] would not have been obvious to one of ordinary skill in the art required to follow Walters' algorithm." A fair reading of this language in context indicates, however, that the Board merely meant to say, as it had only two sentences before, that no more than ordinary skill in the art would have been

required to implement Walters' concept in chip form. The Board was merely emphasizing why it believed Sewall had not invented any part of the invention of the count.

3. Of course, the existence of research or experimentation does not necessarily indicate, by itself, that complete conception did not exist. One must look for a nexus between the research or experimentation and the subject for which patent protection is sought. *See Bac v. Loomis*, 252 F.2d 571, 577, 117 USPQ 29, 34 (CCPA 1958).

(2) *Application of Law to Facts*

█ Having reviewed the record before us in its entirety, we hold that the Board did not commit any legal errors or engage in any clearly erroneous fact finding in reaching its conclusion that Sewall did not jointly conceive the subject matter of the count.

Sewall contends that he designed the hardware described in the specification as corresponding to the subject matter of the count, including that corresponding to element b, and therefore that he is a joint inventor of that subject matter. The record amply supports, however, the Board's contrary holding that Sewall's hardware design was dictated explicitly by Walters' specifications. In addition, Sewall has failed to persuade us that the Board clearly erred in finding that Sewall's design of circuits to carry out Walters' idea was simply the exercise of the normal skill expected of an ordinary chip designer, which did not involve any inventive acts on the part of Sewall.

We also note that the specification of each of the applications states:

[B]ackprojector 44 could be accomplished solely through software, but preferably the components 100, 102, 104 and 105 are implemented with VLSI integrated circuits, the structure of which will become evident in view of their function. [pg. 15, 1. 17]

. . . .

Although the precise electronic components which make up the control circuitry are not shown, the functional description of the back projector 44 will make such control circuitry or program quite evident to those skilled in the art. [pg. 16, 1. 24]

The specification thus renders the presence of Sewall's alleged coinventive contributions, namely, the circuits that he designed, completely optional to the apparatus of the count. It also explicitly states that the design of those circuits is self-evident from their function. Thus, the specification itself indicates

that one of ordinary skill in the art could construct the back projecting apparatus functionally described therein without unduly extensive research or experimentation.[4]

In this regard, contrary to suggestions by Sewall, there is no record evidence that significant work was required to implement the invention of the count. The evidence regarding developmental delays deals with the fabrication and qualification of a commercial prototype of a complete CT scanner, and not with implementing Walters' concept of a back projecting apparatus as recited in the count, let alone with any difficulties in implementing Walters' linearization pointer memory means (element b) in chip form. The fact that it took Star a long time to develop components outside the scope of the count is not relevant to the quality of the conception of the subject matter of the count.

█ Sewall also argues that he contributed to the conception of the subject matter of the count in that he conceived using the interpolation method that he refers to as Word and Word Plus I in the back projecting apparatus. We note, however, that the Walters' '912 patent itself discloses the use of interpolation as a procedure to be performed in reconstructing image data in a CT scanner, and the record is clear that the interpolation used by Sewall was a well-known, common method in the prior art. *See* U.S. Patent No. 4,135,247. In any event, the interpolation method was claimed in dependent claim 19 of the Sewall application, and it is not a necessary limitation of the count.

Notwithstanding the above, it is clear from the record that the inventive aspect of the count lies in the placement of a linearization pointer memory means in a back projecting apparatus of a CT scanner, and not in the particular means used for that linearization pointer memory or any of the other elements of the count. Indeed, declarative evidence of record indicates that, at the time of the invention, it was surprising and unexpected

4. Cannon testified by affidavit that Sewall's contribution to the back projecting apparatus involved the design of the CMOS gate array devices designated as elements 100, 102, and 105 of the Sewall application, and the CMOS interpolation device designated as element 104. However, the count defines an apparatus, not merely a set of CMOS gate arrays and interpolators, and the specification clearly states that such hardware structure is optional and, as the Board found, easily designed by a skilled artisan.

that Walters could achieve the results that he did by placing element b in the back projecting portion of a CT scanner. Sewall has admitted that he did not contribute to the placement of element b. Sewall's testimony of record also indicates that Sewall did not even understand the purpose or function of element b in the apparatus, and moreover, that all Sewall knew about CT scanning at the time of the July 25 meeting was what he had read in Walters' '912 patent.

In addition, the successful computer simulation carried out according to Walters' specifications in April of 1984 demonstrated the operability of every postulate that Walters made to Sewall on or before July 25, 1983, regarding his proposed back projecting apparatus, thus further supporting the Board's holding that, as of July 25, 1983, Walters had a definite and permanent idea of an operative invention. We note that Star emphasized the importance of this simulation in one of its own technical proposals:

> ... This backprojector was completely designed and simulated at the hardware register level prior to the design of the special backprojection chips. The importance of this simulation was demonstrated when 512X512 1000 view images were produced with hardware that compared exactly with the simulated images on the first attempt.

■ Sewall also sets forth several arguments regarding ownership, apparently attempting to establish that Walters' alleged representations regarding ownership somehow estop him from asserting inventorship of the subject matter at issue. We note for Sewall's enlightenment, however, the following:

> It is elementary that inventorship and ownership are separate issues.... [I]nventorship is a question of who actually invented the subject matter claimed in a patent. Ownership, however, is a question of who owns legal title to the subject matter claimed in a patent, patents having the attributes of personal property.

. . . .

> [W]ho ultimately possesses ownership rights in that subject matter has no bearing whatsoever on the question of who actually invented that subject matter. [Citations omitted.]

*Beech Aircraft Corp. v. EDO Corp.,* 990 F.2d 1237, 1248, 26 USPQ2d 1572, 1582 (Fed.Cir. 1993). Clearly, Sewall's ownership arguments have no bearing on the Board's inventorship holding in this interference.

Finally, we note that the record is devoid of any evidence that Walters ever represented or acquiesced that Sewall is a joint inventor. To the contrary, the record indicates that Walters informed Star's attorneys that Sewall was not a joint inventor before the first application was filed. In addition, on June 25, 1987, Walters filed a declaration in the Sewall application informing the PTO that he was the sole inventor of the subject matter for which patent protection was sought. Thus, this case does not involve any estoppel issues regarding any representations made by Walters concerning inventorship.

### B. *Alleged On–Sale Bar*

■ Sewall argues in the alternative that, even assuming that the Board's findings as to conception are correct, the Board erred in failing to find an on-sale bar under 35 U.S.C. § 102(b). Sewall asserts that he raised this issue in both a preliminary motion and in his final brief to the Board.

In his preliminary motions before the Board, Sewall argued that the invention of the count was on sale in May of 1985. However, the critical date under section 102(b) is November 15, 1984, because the Board gave both parties the benefit of Sewall's earlier November 15, 1985, filing date. In this appeal, Sewall argues for the first time that General Electric (GE) placed an order for a back projecting apparatus as recited in the count in July of 1984, more than one year before the earliest filing date of the two applications and that this constituted a sale of the invention barring a patent therefor.[5]

---

**5.** GE entered into a purchase agreement with Star on February 16, 1984. The agreement did not specifically identify a back projecting appara-

tus in accordance with the count. GE later requested that a functional computer simulation be carried out to evaluate the back projecting

**418**

Because this issue was not raised below, we do not decide it in this appeal.

## CONCLUSION

For the foregoing reasons, the decision of the Board is

***AFFIRMED.***

apparatus that it was considering purchasing, and *this computer simulation,* which was a computer model of the subject matter of the count, was completed in April of 1984. GE ultimately ordered the back projecting apparatus on July 24, 1984, and the purchase order invoice listed the contract number posted on the February purchase agreement. Sewall has never contended that the February purchase agreement or any other activities prior to the July 24, 1984, purchase constituted a "sale" under 35 U.S.C. § 102(b).