WINBOND ELECTRONICS CORPORATION and Winbond Electronics North America Corporation, Appellants,

and

Silicon Storage Technology, Inc., Appellant,

and

Sanyo Electric Co., Ltd., Appellant,

and

Macronix International Co., Ltd. and Macronix America, Inc., Intervenors,

v.

INTERNATIONAL TRADE COMMISSION, Appellee,

and

Atmel Corporation, Intervenor.

Atmel Corporation, Appellant,

v.

International Trade Commission,
Appellee,

and

Macronix International Co., Ltd.
and Macronix America, Inc.,
Intervenors,

and

Winbond Electronics Corporation and
Winbond Electronics North America
Corporation, Intervenors,

and

Silicon Storage Technology,
Inc., Intervenor,

and

Sanyo Electric Co., Ltd., Intervenor.

Nos. 01–1031, 01–1032, 01–1034, 01–1128.

United States Court of Appeals,
Federal Circuit.

Aug. 22, 2001.

E. Robert Yoches, Finnegan, Henderson, Farabow, Garrett & Dunner, LLP, of Washington, DC, argued for appellants in 01–1031 and intervenors in 01–1128, Winbond Electronics Corporation, et al. With him on the brief were Doris Johnson Hines, and Kathleen A. Daley. Of counsel were Wayne W. Herrington, R. Bruce Bower, and Yitai Hu. Of counsel were Sturgis M. Sobin, and Frederick David Foster, Ablondi Foster, Sobin & Davidow, P.C., of Washington, DC.

Daniel Johnson, Jr., Fenwick & West LLP, of Palo Alto, CA, argued for appellant in 01–1031 and intervenor in 01–1128, Silicon Storage Technology, Inc.

G. Brian Busey, Morrison & Foerster, LLP of Palo Alto, CA, for appellant in 01–1031 and intervenor in 01–1128, Sanyo Electric Co., Ltd. Of counsel were Karl J. Kramer and Robert L. McKague.

Kirk R. Ruthenberg, Sonnenschein Nath & Rosenthal, of Washington, DC, argued for intervenors in 01–1031 and 01–1128, Macronix International Co., Ltd., et al. With him on the brief was Lisa Pandohie Johnson. Of counsel on the brief was Edward H. Rice, Sonnenschein Nath & Rosenthal, of Chicago, IL.

Timothy Monaghan, Attorney, U.S. International Trade Commission, of Washington, DC, argued for appellee in 01–1031 and 01–1128, International Trade Commission. With him on the brief were Lyn M. Schlitt, General Counsel; Andrea C. Casson, Acting Deputy General Counsel; Michael Diehl, and Jean H. Jackson, Attorneys. Of counsel was James A. Toupin; and Clara Kuehn, Attorneys.

Robert T. Haslam, Heller Ehrman White & McAuliffe LLP, of Menlo Park, CA, argued for appellant in 01–1128 and intervenor in 01–1031, Atmel Corporation. With him on the brief were Stanley Young, and Andrew C. Byrnes. Of counsel on the brief were Louis S. Mastriani, and Michael L. Doane, Adduci, Mastriani & Schaumberg LLP, of Washington, DC, Of counsel was Nitin Subhedar.

Before CLEVENGER, RADER, and DYK, Circuit Judges.

RADER, Circuit Judge.

This opinion is issued pursuant to this court's Order of January 30, 2001.

Despite allegations of inequitable conduct, improper joinder, implied license, and waiver, the United States International Trade Commission undertook enforcement of Atmel Corporation's U.S. Patent No. 4,451,903 (the '903 patent). Because the Commission correctly rejected these challenges to the '903 patent, this court

affirms. The Commission further ordered Atmel to produce attorney work product and other privileged information relating to the inventorship of the '903 patent. Because Atmel waived its attorney-client privilege and work product protections, this court affirms.

### I.

SEEQ Technologies, Inc., the original assignee of the '903 patent, began operation as a semiconductor chip manufacturer in early 1981. Soon after SEEQ began operation, Larry T. Jordan, SEEQ's marketing director, decided to include within each SEEQ memory chip its own identifying information, *e.g.*, manufacturing and programming information. Mr. Jordan named this idea "Silicon Signature."

The '903 patent claims this Silicon Signature technology, as described in *Winbond Electronics Corp. v. International Trade Commission*, 2001 WL 80412, 2001 U.S.App. LEXIS 1274 (Fed.Cir. Jan. 30, 2001). Briefly, the '903 patent claims a semiconductor device and a method for encoding this signature information on a chip. Using the patented invention, a user can easily acquire information about the manufacture of the chip without disturbing the chip's primary functions.

SEEQ's initial planned product was an erasable programmable read only memory (EPROM), which bore the product number 5133. George Perlegos, SEEQ's engineering manager, and George Smarandoiu, a SEEQ engineer, began work on the design of the 5133 EPROM around March 1981. Also in 1981, Anil Gupta, another SEEQ engineer, began work on the design of an electrically erasable read only memory (EEPROM), which bore the product number 5213. The design of both chips was completed around August 1981.

Also in 1981, SEEQ proposed to the Joint Electronics Device Council (JE-DEC), a committee of the Electronic Industries Association charged with setting industry standards, to adopt Silicon Signature as an industry standard. JEDEC studied SEEQ's proposal for six months. During JEDEC's evaluation, SEEQ stated its willingness to grant royalty free licenses (*i.e.*, licenses for a one-time fee) to any manufacturer and to place the subject matter of the '903 patent in the public domain if JEDEC accepted Silicon Signature as a standard. Although JEDEC recommended adoption of Silicon Signature, JEDEC did not actually implement Silicon Signature as a standard.

SEEQ filed the patent application that matured into the '903 patent on September 18, 1981, listing Mr. Jordan as the sole inventor. The '903 patent issued on May 29, 1984. Claim 1 recites:

A device for providing semiconductor product information to a user through electrical interrogation comprising

a primary circuit disposed upon a semiconductor chip,

a product information array disposed on the semiconductor chip adjacent said primary circuit, said product information array including information sufficient to identify at least the manufacturer of the chip,

access means for receiving first and second signals and for selecting said primary circuit in response to said first signal, said access means including a logic circuit means responsive to said second signal for selecting said product information array while simultaneously preventing access to said primary circuit,

output means for providing output signals representative of the information stored in said product information array.

Atmel acquired ownership of the '903 patent in 1994.

In March 1997, based on Atmel's complaint, the Commission initiated an investigation of Macronix International Co., Ltd. and Macronix America, Inc., (collectively "Macronix"), Winbond Electronics Corp. and Winbond Electronics North America Corp. (collectively "Winbond"), and Sanyo (all three collectively "respondents") under section 337 of the Tariff Act of 1930, as amended by 19 U.S.C. § 1337. Atmel alleged that respondents violated section 337 by importing, selling for importation, or selling in the United States semiconductor chips that infringe the claims of three Atmel patents, including the '903 patent. Silicon Storage Technology, Inc. (SST), a company that imports Sanyo and Winbond chips, intervened in the investigation.

During two weeks of hearings before an administrative law judge, the respondents argued that the '903 patent was invalid for improper inventorship. Macronix, Sanyo, and SST argued that Mr. Gupta should have been joined as an inventor of the '903 patent. Winbond asserted that the '903 patent was invalid for nonjoinder, but did not specify which purported inventor the patent lacked-Mr. Gupta, Mr. Smarandoiu, or Mr. Perlegos.

At the hearing, Mr. Gupta testified that he was not an inventor of the '903 patent's claimed device. Mr. Gupta explained that he implemented the elements of the invention of the '903 patent using well-known circuit techniques. Mr. Gupta further testified that as a young engineer, he did not have the breadth of experience to "come up with Silicon Signature."

In his initial determination of March 19, 1998, the administrative law judge concluded that an incorrect listing of inventors prevented enforcement of the '903 patent.

The administrative law judge also refused to enforce the '903 patent because SEEQ waived its right to exclude others from using Silicon Signature during its discussions with JEDEC.

Upon the parties' requests, the Commission held a hearing to review the administrative judge's decision. In its opinion, the Commission held the '903 patent "unenforceable for failure to name an inventor" and thus determined that none of the respondents violated section 337. *In the Matter of Certain EPROM, EEPROM, Flash Memory, and Flash Microcontroller Semiconductor Devices and Products Containing Same*, Investigation No. 337–TA–395 (July 9, 1998). In addressing inventorship, the Commission explained the issue in this case: "The question is whether the person(s) who selected particular circuit structures for each of the means plus function claim elements (presumably Gupta) is a co-inventor." *Id.*, slip op. at 13. The Commission further stated that: "Since the Commission has no power to correct inventorship, the '903 patent is unenforceable unless and until either the PTO or a court makes the correction." *Id.*

Chairman Bragg's supplemental views addressed several issues beyond inventorship. *See In the Matter of Certain EPROM, EEPROM, Flash Memory, and Flash Microcontroller Semiconductor Devices and Products Containing Same*, Investigation No. 337–TA–395 (July 9, 1998) (Supplemental Views of Chairman Bragg). Of particular relevance, Chairman Bragg determined: "[T]here is no basis in law for any contention that the '903 patent is not enforceable due to waiver and implied license by legal estoppel." *Id.*, slip op. at 2.

In August 1998, following the Commission's opinion, Atmel petitioned the United States Patent and Trademark Office (PTO) to add Mr. Gupta as an inventor of the '903 patent. The PTO granted Atmel a

Certificate of Correction identifying Mr. Gupta and Mr. Jordan as joint inventors of the '903 patent. On September 8, 1998, Atmel petitioned the Commission for a rehearing on the proper inventors. The Commission remanded to the administrative law judge to assess the inventor issue and the Certificate of Correction.

In his second initial decision, the administrative law judge again found the '903 patent unenforceable. In particular, the administrative law judge held that the Certificate of Correction named incorrect inventors and that Atmel committed inequitable conduct in obtaining it from the PTO. The administrative law judge found that Mr. Gupta could not be a co-inventor of the '903 patent because SEEQ had first installed Silicon Signature circuitry on its 5133 EPROM device, a device that Mr. Gupta did not work on. The administrative law judge further found that Atmel had intentionally withheld material information concerning the inventors of the '903 patent with intent to deceive the PTO into promptly issuing a Certificate of Correction. During the course of the reconsideration proceeding, the administrative law judge issued Order No. 50 requiring Atmel to produce attorney-client privileged and work product protected documents concerning the inventors of the '903 patent.

Upon Atmel's request, the Commission held another hearing to review the administrative law judge's second initial decision. In its October 16, 2000 opinion, the Commission determined that issues about the proper inventors of the '903 patent did not prevent enforcement of the exclusive right. *In the Matter of Certain EPROM, EEPROM, Flash Memory, and Flash Microcontroller Semiconductor Devices and Products Containing Same,* Investigation No. 337–TA–395 (Oct. 16, 2000). The Commission found that Atmel did not commit inequitable conduct before the USPTO during the correction proceedings and that the Certificate of Correction lists the correct inventors. The Commission also determined that "Atmel placed at issue the advice of counsel by its affirmative act of petitioning the Commission for reconsideration of the inventorship issue based on a certificate of correction of the '903 patent issued by the PTO." *Id.,* slip op. at 12. The Commission thus held that Atmel waived its attorney-client privilege and work product protections for all documents concerning the '903 patent's inventors.

Finally, the Commission adopted Chairman Bragg's Supplemental Views. *Id.* at 63. Thus, the Commission found that neither waiver nor implied license doctrines precluded enforcement of the '903 patent. As a remedy for violation of section 337, the Commission issued a limited exclusion order covering the respondents' accused semiconductor devices and circuit boards containing those devices.

In December 2000, Respondents and SST filed motions for stays, pending appeal, of the limited exclusion order issued by the Commission. This court denied the motions for stays and instead ordered an expedited review due to the impending expiration of the '903 patent. This court heard oral argument from all parties on January 16, 2001 and issued a non-precedential opinion and order on January 30, 2001. The January 30 opinion gave judgment as to the parties' dispute over infringement of the '903 patent. *Winbond,* 2001 WL 80412, 2001 U.S.App. LEXIS 1274. The order affirmed the remainder of the Commission's determinations in dispute. *Winbond Elecs. Corp. v. Int'l Trade Comm'n,* order (Fed.Cir. Jan. 30, 2001). This opinion explains this court's judgment as outlined in the order of January 30, 2001.

Respondents and SST appeal the Commission's enforceability judgment. Atmel appeals the Commission's judgment that it waived its attorney-client privilege and work product protections. This court has jurisdiction to consider these appeals under 28 U.S.C. § 1295(a)(6) (1994).

## II.

■ "Inequitable conduct resides in failure to disclose material information, or submission of false material information, with an intent to deceive, and those two elements, materiality and intent, must be proven by clear and convincing evidence." *Kingsdown Med. Consultants, Ltd. v. Hollister, Inc.*, 863 F.2d 867, 872, 9 USPQ2d 1384, 1389 (Fed.Cir.1988). This court reviews the Commission's factual findings on materiality and intent for substantial evidence. *Tandon Corp. v. United States Int'l Trade Comm'n*, 831 F.2d 1017, 1019, 4 USPQ2d 1283, 1284–85 (Fed.Cir.1987); *Am. Hosp. Supply Corp. v. Travenol Labs., Inc.*, 745 F.2d 1, 6, 223 USPQ 577, 583 (Fed.Cir.1984). This court reviews without deference the legal questions of inventorship, *Sewall v. Walters*, 21 F.3d 411, 415, 30 USPQ2d 1356, 1358 (Fed.Cir. 1994), and implied license and waiver, *Wang Labs., Inc., v. Mitsubishi Elecs. Am., Inc.*, 103 F.3d 1571, 1580, 41 USPQ2d 1263, 1270 (Fed.Cir.1997).

This court reviews procedural and evidentiary determinations made by the Commission under Federal Circuit law. *See Texas Instruments, Inc. v. Tessera, Inc.*, 231 F.3d 1325, 1328, 56 USPQ2d 1674, 1676–77 (Fed.Cir.2000). This court, however, has not yet addressed the standard of review for waivers of attorney-client privilege under its own law. This court's sister circuits are split on the standard of review for such a determination. The Fourth, Sixth and Ninth Circuits review a trial court's de-termination on attorney-client privilege matter without deference. *Chaudhry v. Gallerizzo*, 174 F.3d 394, 402 (4th Cir. 1999); *United States v. Dakota*, 197 F.3d 821, 825 (6th Cir.1998); *United States v. Mendelsohn*, 896 F.2d 1183, 1188 (9th Cir.1990). The Second, Third, and Tenth Circuits, however, review such actions for an abuse of discretion. *In re Grand Jury Proceedings*, 219 F.3d 175, 182 (2d Cir.2000); *In re Grand Jury*, 138 F.3d 978, 980–81 (3d Cir. 1998); *Frontier Ref. Inc. v. Gorman Rupp Co.*, 136 F.3d 695, 699 (10th Cir. 1998). In this case, the particular issue is the standard of review for the temporal scope of a waiver of attorney-client privilege.

This court generally reviews evidentiary determinations of the Commission for an abuse of discretion. *NEC Corp. v. United States*, 151 F.3d 1361, 1375 (Fed.Cir. 1998); *see also Munoz v. Strahm Farms, Inc.*, 69 F.3d 501, 503, 36 USPQ2d 1499, 1501 (Fed.Cir.1995) (citation omitted). As an evidentiary determination, the temporal scope of the attorney-client privilege and work product protection fits consistently within this court's view of the discretion of the Commission. In related matters, this court has reviewed a trial court's determination of waivers of various procedural and evidentiary matters for an abuse of discretion. *F.LLI De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1031 (Fed.Cir. 2000); *United States v. Ziegler Bolt & Parts Co.*, 111 F.3d 878, 882 (Fed.Cir. 1997) ("This court places waiver within the discretion of the trial court, consistent with its broad duties in managing the conduct of cases."). Thus, this court reviews the Commission's determination of the temporal scope of waiver of an attorney-client privilege and work product protection for an abuse of discretion.

## I. Inventorship

■ The Patent Act accords each patent a presumption of validity. 35 U.S.C. § 282 (1994). This presumption embraces as well the notion that a patent's named inventors are the true and only inventors. *Hess v. Adv. Cardiovascular Sys., Inc.,* 106 F.3d 976, 980, 41 USPQ2d 1782, 1785–86 (Fed.Cir.1997). A Certificate of Correction extends that presumption to the corrected document.

The Patent Act authorizes corrections to the listing of inventors in 35 U.S.C. § 256 (1999):

> Whenever through error a person is named in an issued patent as the inventor, or through error an inventor is not named in an issued patent and such error arose without any deceptive intent on his part, the Director *may,* on application of all the parties and assignees, with proof of the facts and such other requirements as *may* be imposed, issue a certificate correcting such error.

(Emphasis added.) Section 256 requires a showing of error without deceptive intent. It expressly grants the Director authority to set standards for this showing.

The PTO's current regulation for correcting inventorship under the Director's authority in Section 256 is 37 C.F.R. § 1.324 (1997). The PTO Rule 324 requires a party requesting a correction of inventorship to submit a proper petition, including:

> (1) Where one or more persons are being added, a statement from each person who is being added as an inventor that the inventorship error occurred without any deceptive intention on his or her part;
>
> (2) A statement from the current named inventors who have not submitted a statement under paragraph (b)(1) of this section either agreeing to the change of inventorship or stating that they have no disagreement in regard to the requested change;
>
> (3) A statement from all assignees of the parties submitting a statement under paragraphs (b)(1) and (b)(2) of this section agreeing to the change of inventorship in the patent, which statement must comply with the requirements of § 3.73(b) of this chapter; and
>
> (4) The fee set forth in § 1.20(b).

37 C.F.R. § 1.324(b) (1997).

■ "Incorrect inventorship is a technical defect in a patent that may be easily curable." *Canon Computer Sys., Inc. v. Nu–Kote Int'l, Inc.,* 134 F.3d 1085, 1089, 45 USPQ2d 1355, 1359 (Fed.Cir.1998). Rule 324 permits such an easy cure. Rule 324 reasonably carries out the Director's broad authority to set standards for 35 U.S.C. § 256. The presumption of validity under 35 U.S.C. § 282 thus extends to corrections in the listing of inventors in accordance with Rule 324. Because Atmel complied with this rule, it properly corrected the inventors of the '903 patent and acquired a presumption of validity for the correction.

■ To rebut this presumption, a party challenging patent validity for omission of an inventor must present "clear and convincing, corroborated evidence" that the correction was improper. *C.R. Bard, Inc. v. M3 Sys., Inc.,* 157 F.3d 1340, 1352, 48 USPQ2d 1225, 1233 (Fed.Cir.1998). Respondents and SST, therefore, bear the burden of showing that the '903 patent is invalid under 35 U.S.C. § 102(f) (1994). *Hess,* 106 F.3d at 980. The Commission correctly found that respondents and SST did not meet this burden.

■ "Inventorship is a question of who actually invented the subject matter claimed in a patent." *Sewall,* 21 F.3d at 417 (quoting *Beech Aircraft Corp. v. EDO*

*Corp.,* 990 F.2d 1237, 1248, 26 USPQ2d 1572, 1582 (Fed.Cir.1993)). "The contributor of any disclosed means of a means-plus-function claim element is a joint inventor as to that claim." *Ethicon, Inc. v. U.S. Surgical Corp.,* 135 F.3d 1456, 1463, 45 USPQ2d 1545, 1548 (Fed.Cir.1998). In the present case, the parties agree that "the person(s) who selected particular circuit structures for each of the means plus function elements ... is a co-inventor [of the '903 patent]." *Commission I,* 2001 WL 80412, slip op. at 13.

Respondents and SST assert that the 5133 EPROM, designed by Mr. Perlegos and Mr. Smarandoiu, reduced to practice the Silicon Signature technology before the 5213 EEPROM, designed by Mr. Gupta. Accordingly, respondents and SST argue that Mr. Gupta is not the correct co-inventor of the '903 patent. To support their assertion that the 5133 EPROM was the first device to contain Silicon Signature, respondents and SST put forth the testimony of Mr. Perlegos and Mr. Smarandoiu.

Mr. Perlegos testified that he was the manager for the design of both the 5133 EPROM and the 5213 EEPROM. He further testified that "somebody else" was actually working on the 5133 EPROM chip. In his original testimony, Mr. Perlegos stated that he believed the 5133 EPROM first implemented the Silicon Signature technology. In later testimony, Mr. Perlegos stated that he does not have a personal recollection as to which device was the first to incorporate Silicon Signature.

Mr. Smarandoiu testified that he and Mr. Perlegos alone worked on the design of the 5133 EPROM. Mr. Smarandoiu further testified that he did not remember designing specific Silicon Signature circuits for the 5133 EPROM. Instead Mr. Smarandoiu testified that it was unlikely that the first version of the 5133 EPROM included Silicon Signature. This EPROM was SEEQ's first product. To meet strict time requirements, Mr. Smarandoiu believed that SEEQ would have included as few "bells and whistles" as possible.

As the Commission correctly found, the testimony of Messrs. Perlegos and Smarandoiu did not present clear and convincing proof that the 5133 EPROM was the first device to contain Silicon Signature. Thus, respondents and SST did not meet their burden of proving that the '903 patent is invalid.

Respondents and SST argue that some inconsistencies between Mr. Gupta's testimony and minutes from a SEEQ Board of Directors meeting undermine the Commission's conclusion that Mr. Gupta was the first to implement Silicon Signature. However, because respondents and SST did not present clear and convincing evidence that someone other than Mr. Gupta was a co-inventor of the '903 patent, Atmel was not required to present any rebuttal evidence that Mr. Gupta was indeed the true, and only other, co-inventor. Again, the Commission correctly assessed the evidence.

### B. Inequitable Conduct

 "[I]nequitable conduct in patent procurement derives from the equitable doctrine of unclean hands: that a person who obtains a patent by intentionally misleading the PTO can not enforce the patent." *Demaco Corp. v. F. Von Langsdorff Licensing, Ltd.,* 851 F.2d 1387, 1394, 7 USPQ2d 1222, 1228 (Fed.Cir.1988). A court may hold a patent unenforceable for inequitable conduct when an applicant submits material false information, or fails to submit material information, with an intent to deceive the PTO. *Kingsdown,* 863 F.2d at 872.

In its petition to the PTO for correction, Atmel explained: (1) the Commission found the '903 patent unenforceable for failure to name a co-inventor; (2) the Commission made no findings on the issue of deceptive intent in the failure to name Mr. Gupta as a joint inventor; and (3) the '903 patent was involved in district court litigation at that time. Atmel further filed Mr. Gupta's declaration that he is a co-inventor of the claimed subject matter.

Atmel did not submit testimony of some witnesses from the Commission's 1997 investigation to the PTO. This omission did not constitute inequitable conduct. Rule 324, as recited above, does not require parties requesting correction of inventorship to submit any evidence to verify the inventive contributions of the added co-inventor. 37 C.F.R. § 1.324. However, because all the parties have persistently argued whether Atmel's failure to submit certain testimony to the PTO constituted inequitable conduct, this court will address the merits of this argument.

During the Commission's 1997 investigation, Mr. Gupta testified that he was not involved in the development of the '903 patent. In the same testimony, however, Mr. Gupta also testified that he "implemented" Mr. Jordan's idea in silicon. In other words, Mr. Gupta testified that he implemented the '903 patent by designing circuits for the 5213 EEPROM. In its first opinion, the Commission determined that the person who designed the circuits recited in the means-plus-function elements of the '903 patent's claims was a co-inventor of the patent. The Commission stated that Mr. Gupta was presumably that person. In his declaration to the PTO, Mr. Gupta stated:

The standard for inventorship as it relates to the '903 patent has been explained to me. Based on my understanding of that standard, I hereby state that I have made an inventive contribution to the subject matter claimed in the '903 patent, whereby I am a co-inventor of the claimed subject matter of the '903 patent.

Thus, the Commission was well within its discretion to find that Mr. Gupta's testimony was consistent throughout because in his initial testimony he simply did not know that his contribution made him a co-inventor under the law.

As described above, Mr. Perlegos also testified before the administrative judge that Silicon Signature was first implemented in the 5133 EPROM. The Commission found this testimony material to inventorship because it contradicted Atmel's addition of Mr. Gupta, who did not work on the 5133 EPROM. Mr. Perlegos' testimony, however, was uncorroborated. Furthermore, Mr. Perlegos later testified that he did not have a personal recollection of which device first incorporated Silicon Signature. The Commission, therefore, found Mr. Perlegos' original testimony unreliable. Such reliability findings are within the Commission's discretion. Substantial record evidence, therefore, supports the Commission's finding that Atmel's decision to exclude these contested assertions from their correction petition was not a material omission.

Finally, the Commission found that respondents and SST did not show clear and convincing evidence of deceptive intent on the part of Atmel in its decision to exclude some testimony. In 1997, the PTO modified Rule 324 to delete language that had called for "satisfactory proof of facts" relating to lack of deceptive intent in omitting an inventor. 62 Fed.Reg. 53132, 53171 (1997) ("The requirement for factual showings to establish a lack of deceptive intent is deleted, with a statement to that effect being sufficient."). The only credible record evidence suggesting deceptive

intent indicated that Atmel wanted to correct inventorship of the '903 patent quickly to renew its case before the Commission. The Commission correctly detected no link between Atmel's desire for swift correction and any intent to deceive the PTO into granting a Certificate of Correction. Furthermore, the record shows that Atmel proffered internal documents and testimony of its good faith belief that the PTO did not want any additional evidence of lack of deceptive intent under the new Rule 324. Thus, substantial evidence supports the Commission's finding that Atmel did not exclude the 1997 testimonies with intent to deceive.

### C. Implied License/Waiver

An implied license signifies a patentee's waiver of the statutory right to exclude others from making, using, selling, offering to sell, or importing, the patented invention. *See Wang Labs.*, 103 F.3d at 1580. According to the Supreme Court:

> Any language used by the owner of the patent, or any conduct on his part exhibited to another from which that other may properly infer that the owner consents to his use of the patent in making or using it, or selling it, upon which the other acts, constitutes a license and a defense to an action for a tort.

*De Forest Radio Tel. Co. v. United States,* 273 U.S. 236, 241, 47 S.Ct. 366, 71 L.Ed. 625 (1927). An implied license finding requires a nexus between the patentee's purported waiver and the infringing action. *Stickle v. Heublein, Inc.,* 716 F.2d 1550, 1559, 219 USPQ 377, 383 (Fed.Cir.1983) (affirming a determination of no implied license because the act of infringement occurred after and was distinct from the conduct of the patentee); *Bandag, Inc. v. Al Bolser's Tire Stores, Inc.,* 750 F.2d 903, 925–26, 223 USPQ 982, 998 (Fed.Cir.1984). In this case, the nexus must link SEEQ's

discussions with JEDEC in 1981–1983 with a grant to all semiconductor industry members, including respondents and SST, of an implied license to the '903 patent.

An implied license may arise by equitable estoppel, acquiescence, conduct, or legal estoppel. *Wang Labs.,* 103 F.3d at 1580. An implied license by equitable estoppel requires proof that: (1) the patentee, through statements or conduct, gave an affirmative grant of consent or permission to make, use, or sell to the alleged infringer; (2) the alleged infringer relied on that statement or conduct; and (3) the alleged infringer would, therefore, be materially prejudiced if the patentee is allowed to proceed with its claim. *See Wang Labs.,* 103 F.3d at 1581; *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.,* 960 F.2d 1020, 1028, 22 USPQ2d 1321, 1325 (Fed.Cir.1992). The first element requires the patentee to communicate that "the accused infringer will not be disturbed by the plaintiff patentee in the activities in which the former is *currently* engaged." *A.C. Aukerman,* at 1042 (emphasis added). Thus, for this form of estoppel, the alleged infringer must have knowledge of the patentee and its patent and must reasonably infer that the patentee acquiesced to the allegedly infringing activity for some time. *Id.*

In the present case, SST admitted that it was unaware of the '903 patent before Atmel sought a license in 1994. Thus, the Commission properly determined that SST cannot assert an implied license to the '903 patent by equitable estoppel. Further, SST and Macronix presented no evidence that they were aware of any of SEEQ's statements to JEDEC before the present litigation. Thus, the Commission did not abuse its discretion in determining that Macronix was not entitled to an implied license through equitable estoppel.

Finally, in its communications with JEDEC, SEEQ qualified its offer of royalty free licenses with the requirement that JEDEC accept Silicon Signature as a standard. In a letter to JEDEC, SEEQ's counsel specifically stated:

> Seeq did not want to be in the position of having proposed a standard which would require the industry to pay royalties to it, and, thus, offered royalty free licenses on an industry wide basis in the event that the standard was adopted.... I will repeat to you on behalf of Seeq that if such a standard is adopted and the standard reads on Seeq's patent claims, Seeq is, of course, willing to grant a royalty free license to the industry to use the invention.

Because JEDEC did not accept Silicon Signature as a standard, the Commission correctly found that SEEQ did not give an affirmative grant of consent or permission to make, use, or sell the claimed invention. Thus, the Commission correctly found that neither respondents nor SST are entitled to an implied license either through equitable estoppel, acquiescence, or SEEQ's conduct.

■ For a finding of implied license through legal estoppel, a patentee must have "licensed or assigned a right, received consideration, and then sought to derogate from the right granted." *Wang Labs.*, 103 F.3d at 1581. In the present case, the record does not show that either respondents or SST obtained any license under the '903 patent from SEEQ or Atmel.

Respondents and SST also argue that Atmel has waived its right to exclude members of the semiconductor industry from practicing the '903 patent with the statements SEEQ made to JEDEC between 1981–1983. However, as explained above, SEEQ's promise to grant royalty-free licenses and place the content of the '903 patent in the public domain was conditional on JEDEC's acceptance of Silicon Signature. Because JEDEC did not accept Silicon Signature, the Commission correctly concluded that SEEQ maintained its right to exclude others from practicing the '903 patent.

### D. Work Product Protection/Attorney–Client Privilege

■ In affirming the administrative law judge's determination that Atmel waived its attorney-client privilege and work product protection for documents and communications relating to inventorship of the '903 patent, the Commission stated:

> [B]y expressly relying on [Mr.] Gupta's statement as a central part of its effort to obtain a certificate of correction and then using that certificate to convince the Commission to reconsider the enforceability of the '903 patent, Atmel explicitly placed the legal advice to [Mr.] Gupta—and the fact that [Mr.] Gupta had obtained that advice—"at issue" in these proceedings.

On appeal, Atmel concedes that it waived its attorney-client privilege and work product protection. Atmel, however, disputes the temporal scope of that waiver.

The administrative law judge, in Order No. 54, clarified that Atmel was not required to produce any documents generated before January 1997, when Atmel filed its complaint with the Commission. The administrative law judge further clarified that Atmel was not required to produce attorney-client communications or attorney work product made in preparation for the 1998 reconsideration hearing. The Commission affirmed the administrative law judge's temporal limitations on the scope of Atmel's waiver.

Atmel seeks to further limit its waiver to the time period between July 9, 1998 and August 13, 1998. This period, after issuance of the Commission Opinion explaining inventorship law and before the filing of Atmel's correction petition to the PTO, was when Atmel's counsel explained inventorship law to Mr. Gupta. Thus, argues Atmel, only this time period is relevant to the attorney-client communication put "in issue" by Mr. Gupta's statement to the PTO.

When requesting the Commission to reconsider its initial determination on inventorship, Atmel argued:

> At the time [Mr. Gupta and Mr. Jordan] testified, the law as they, and Atmel, understood it was that the inventor of a patent is the person who conceives the elements of an invention, and not the person who designs the specific circuitry involved.... [A]fter Messrs. Jordan and Gupta testified in the ITC proceedings, the applicable law changed.

Atmel continued by explaining that Mr. Gupta understood that he was an inventor upon receiving an explanation of the law enunciated by this court's *Ethicon* opinion. Thus, the Commission correctly found that Atmel put at issue Mr. Gupta's, and thus its attorneys', understanding of inventorship law both before and after the Commission's initial decision. This court has held that a patentee's inadvertent waiver of attorney-client privilege in a patent infringement litigation is a general waiver "for all purposes." *Genentech, Inc. v. United States Int'l Trade Comm'n*, 122 F.3d 1409, 1416, 43 USPQ2d 1722, 1728 (Fed.Cir.1997). Thus, the Commission did not abuse its discretion in limiting Atmel's waiver to the time period from January 1997, during Atmel's preparations for the Commission's initial investigation, up to communications and documents pertaining to Atmel's preparations for the Commission's reconsideration hearing.

## CONCLUSION

This court affirms the Commission's determination to enforce the '903 patent and Atmel's waiver of its attorney-client privilege and work product protections from January 1997 up to Atmel's preparations for the Commission's reconsideration.

## COSTS

Each party shall bear its own costs.

*AFFIRMED.*